**UNITED STATES of America**

**v.**

**John GATTO, Mario Mosiello, Dolly Stampone, and Michael Hajdu.**

**Crim. No. 22755.**

United States District Court
E. D. Pennsylvania.

May 9, 1969.

Drew J. T. O'Keefe, U. S. Atty., Jerome R. Richter, Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

G. Fred Di Bona, Philadelphia, Pa., for defendant Mario Mosiello.

## OPINION

JOSEPH S. LORD, III, District Judge.

John Gatto, Dolly Stampone, Michael Hajdu, and Mario Mosiello were tried on a four-count indictment charging conspiracy and interstate travel in furtherance of racketeering enterprises. The only post-trial motions have been filed by defendant Mosiello, convicted on the three counts charged against him, who moves here for judgment of acquittal and, in the alternative, for a new trial. For the reasons given below, these motions are denied.

### I. MOTION FOR JUDGMENT OF ACQUITTAL

The basis for the motion for judgment of acquittal is the alleged insufficiency of the evidence of the offense charged in the indictment. Defendant argues that the indictment charged interstate travel to promote an illegal horse-betting operation [1] and that proof was lacking that he conspired in this activity. Although it is impliedly conceded that there was sufficient proof of Mosiello's participation in an illegal lottery (numbers), it is argued that this kind of activity was not charged in the indictment. We believe that there was sufficient evidence that Mosiello was guilty of the

[1]. 18 U.S.C. § 1952.

crimes charged as to illegal horse-betting and also that the indictment charged crimes relating to both horse-betting and illegal lottery.

Mosiello asserts that "[t]he conspiracy at trial was one of a horse-betting variety" because, he says, the indictment charges offenses relating to a "bookmaking" enterprise. *Most* of the evidence adduced at trial did, indeed, go to prove an illegal horse-betting operation. There was strong proof that defendants Gatto, Hajdu and Stampone were involved in illegal horse-betting in the Easton area, including Pennsylvania and New Jersey. This operation was conducted in two locations in Easton: 148 Canal Street and 108 South Third Street. In addition to the evidence of horse-betting, Gatto was shown to have been in possession of numbers paraphernalia at the time of his arrest.

The evidence against Mosiello was that he made frequent trips from New York City to visit Gatto in Easton; that Mosiello was present on the premises of 148 Canal Street on five or seven occasions; that after operations commenced at 108 South Third Street, the address of Dolly Stampone, in July of 1965, Mosiello made at least one visit there; that on the day of his arrest Mosiello had on his person the 'phone number of Dolly Stampone; that at that time he was in the company of Gatto; and that he then had with him $500 which he admitted receiving that day from Gatto, although he had claimed it was borrowed because of his wife's illness. This evidence alone would be insufficient to support an inference of guilt.

However, Mrs. Marion Alvin testified that from the fall of 1964 until July of 1965 she lived in an apartment on the second floor of 148 Canal Street. She said she was friendly with Gatto and was present on the first floor of the building on many occasions. It was she who testified that Mosiello was there on five or seven occasions. Mrs. Alvin testified that on one occasion Gatto introduced Mosiello to her at 148 Canal Street as "my boss from New York"; Mosiello responded: "She is alright [sic]. Why don't you get her to write numbers?" We think that this testimony in light of the other evidence of Gatto's involvement in illegal horse-betting and the other evidence of Mosiello's activities, was sufficient evidence for the jury to find Mosiello guilty of the horse-betting conspiracy and horse-betting offenses charged in the indictment. On the facts adduced at trial the jury could conclude that since Mosiello was Gatto's boss he was directing and was responsible for Gatto's activities, horse-betting an illegal lottery.

■ The fact that Mosiello suggested to Gatto that he enlist Mrs. Alvin in the writing of numbers does not mean that he was Gatto's boss only as to numbers activities. Nor does it matter that there was no direct evidence of Mosiello's involvement in illegal horse-betting. Proof of conspiracy, 18 U.S.C. § 371, "may rest as it frequently does, on indirect or circumstantial evidence." United States v. Barrow, 363 F.2d 62, 64 (C.A. 3, 1966), cert. den. 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967).

But even if the evidence were insufficient to establish Mosiello's guilt as to the horse-betting activities, it is undisputed that there was ample evidence that Mosiello was Gatto's boss in a numbers operation. The defendant argues, however, that the indictment does not charge the commission of crimes relating to numbers because of the use of the word "bookmaking", which, it is claimed, relates to horse-betting only and not to numbers.

■■ The standards for judging the sufficiency of an indictment are as follows:

"* * * The sufficiency of an indictment is determined by practical rather than technical considerations. [case cited]. The test is not whether it could not have been more artfully and precisely drawn, [case cited], but rather its adequacy is measured by whether it contains the elements of the offense intended to be charged,

whether it sufficiently apprises the defendant of what he must be prepared to meet, and in the event that subsequent proceedings are brought against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction. [citing United States v. Krepper, 159 F.2d 958, 968 (C.A. 3, 1946), cert. den. 330 U.S. 824, 67 S.Ct. 865, 91 L.Ed. 1275 (1947)] * * *."

United States v. Wolfson, 294 F.Supp. 267 (D.Del.1968).

■ The indictment here charges the federal crime of traveling between states in order to further and carry on a bookmaking operation in violation of Pennsylvania law, 18 U.S.C. § 1952, to wit, 18 P.S. §§ 4601, 4602, 4603 and 4607, (Counts II, III and IV); a conspiracy to commit crimes under 18 U.S.C. § 1952 in violation of 18 U.S.C. § 371 (Count I); and aiding and abetting the crimes above in violation of 18 U.S.C. § 2 (Counts II, III and IV). All of these federal crimes are derived from the alleged violation of Pennsylvania law. 18 P.S. § 4601 prohibits "Lotteries"; Section 4602, "Traffic in Lottery Tickets"; Section 4603, "Common Gamblers"; and Section 4607, "Pool-selling and bookmaking." Although Sections 4603 and 4607 embrace both numbers and horse-betting, the first two sections deal *only* with illegal lottery. Thus, it cannot be said that the indictment charges only illegal horse-betting. Nor do we think that the defendant was prejudiced by the perhaps inartful use of the word "bookmaking" (a bookmaker is "one that determines odds and receives and pays off bets." Webster's Third International Dictionary [1963]). The indictment clearly charges interstate violation of Pennsylvania laws treating solely of lottery. Since horse-betting would not have been a violation of these laws, the defendant must certainly have known that he was being charged with something other than horse-betting, namely, lottery activities. If specificity had been wanting, the defendant was free to move for a bill of particulars.

■ Assuming that there was a failure of proof linking him with the horse-betting operation (and we do not think there was), and that the evidence of an illegal lottery was sufficient (not here in dispute), did Mosiello suffer harm because the conspiracy charged was engaged in two kinds of illegal activity and not just one? We think not. The fact that the government's proof of lottery activity may have failed as to Stampone and Hajdu does not affect the indictment. Even if we were to read the indictment as charging two conspiracies *arguendo,* we think that Mosiello was not prejudiced under the circumstances of this case, for it cannot reasonably be said "that the proof operated to prejudice his case, or that it came as a surprise; and certainly the fact that the proof disclosed *two conspiracies* instead of one, *each within the words of the indictment,* cannot prejudice his defense of former acquittal of the one or former conviction of the other, if he should again be prosecuted." (Emphasis supplied). Berger v. United States, 295 U.S. 78, 83, 55 S.Ct. 629, 631, 79 L.Ed. 1314 (1934).[2] Here, of course, Mosiello will have the defense of former conviction as to both conspiracies on our view of the evidence, even assuming that the indictment did not charge one conspiracy engaging in two kinds of illegal gambling.[3]

## II. MOTION FOR A NEW TRIAL

### A.

Defendant Hajdu gave two statements to the F. B. I. at or near the time of his

---

2. *Compare* United States v. Goss, 329 F. 2d 180 (C.A. 4, 1968), *with* Grissette v. United States, 313 F.2d 187 (C.A. 5, 1963).

3. This is not, of course a case such as Stirone v. United States, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed. 252 (1960), where the indictment charged only one conspiracy and the defendant was convicted of another.

arrest. In the first one to Agent Hackman he said, *inter alia:*

"I am just a donkey in this operation. I work on 25 percent. I am paid on the basis of 25 percent of the business I handle. If I am going to be arrested, I hope you arrest my boss also."

In the second statement, given to two other agents, which Hackman did not hear, he embellished this by naming defendant Gatto as his boss. The government first offered the second statement, proposing to delete Gatto's name. When it was pointed out that cross-examination by counsel for defendants Mosiello and Stampone would leave Gatto odd man out, the first statement (*supra*) was offered and admitted through Agent Hackman. The court immediately instructed the jury:

"I am going to caution the jury at this point.

"Members of the jury, you have heard the witness's testimony. There has been no mention by him of any person other than Mr. Hajdu. You are not permitted on this evidence to speculate or guess or conjecture as to who the boss might be. *It might be anybody in this world.*

"Since there is no evidence on it as yet, you can not guess in your minds or speculate or conjecture as to who it might be." (Emphasis supplied).

Later, when it appeared that the requisite warnings and advice had not been given before the first statement was taken, it was stricken in its entirety. The jury was told:

"THE COURT: Members of the jury, I don't think that there is any kind of case that so frequently gives rise to many questions of law as the kind of a case that we are trying now, a conspiracy case.

"We have been together in my chambers since five minutes of 10 arguing about the question of law that arose yesterday in respect to the admissibility of the statement testified to as allegedly given by Mr. Hajdu.

"You will remember yesterday that I instructed you or advised you that certain constitutional safeguards have been thrown around the accused in a criminal prosecution. These are not mere technicalities. They are important constitutional safeguards that apply to every citizen, rich or poor, white or black, high or low. And if they didn't, they would be of no value whatsoever to the innocent or to the guilty. They are constitutional safeguards. They are not technicalities and they are important.

"The question here was whether or not the constitutional safeguards were complied with when the statement was given by Mr. Hajdu.

"After listening to lengthy arguments, I have held that they were not complied with by the FBI. For that reason, I felt that the statement allegedly given by Mr. Hajdu at the time of his arrest was inadmissible and should not have come into evidence.

"I have previously instructed you that when evidence comes in and you hear it which is later determined to be inadmissible and shouldn't have come in that you must disregard that evidence completely when it is stricken from the record. It is not to influence you. It is not to color your minds in any way because that is evidence that should not have been in the case and evidence that should not have been heard.

"Here, again, I emphasize this is not just simply some technicality. This is something that the Constitution of the United States requires; and the Constitution, members of the jury, is too sacred a document, too important, too much of a touchstone of our system of jurisprudence and too much of a foundation of our liberties to ever be regarded as a mere technicality. It is too important.

"Therefore, I am instructing you that the testimony as to the statement of Mr. Hajdu is out of the case and

that it must be disregarded entirely by you and, if possible, forgotten.

"If you didn't do that, you would be doing less than your duties as jurors; and I am sure that you will do no less than your duties."

Mosiello complains that even though he was not named in the statement, and even though the statement was ultimately stricken in its entirety, and in spite of the court's emphatic instructions to the jury, his conviction cannot stand under Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

We cannot say that Hajdu's statement inculpated Mosiello in the *Bruton* sense so as to require a new trial. First, as in United States v. Lipowitz (Appeal of Smith), 407 F.2d 597 (C.A. 3, 1969), there was no inculpation of Mosiello by name. The "boss" referred to by Hajdu could have been anyone, *cf. Lipowitz* (Appeal of Smith), supra, and the jury was so instructed. The instructions went beyond a mere charge to consider a confession only as to the confessor and disregard it as to a named defendant It was an affirmative caution that it in fact implicated no one except Hajdu. Second, the confession ultimately did not remain in the record for any purpose whatever. It was stricken even as to Hajdu and the jury was emphatically told to disregard it entirely. In United States v. Lipowitz (Appeal of Muller), 401 F.2d 591, at page 593 (C.A. 3, 1968), the court said:

"The facts presented in the instant appeal materially differ from the facts and holding in *Bruton*. Here, the entire testimony of the witness was stricken and the jury specifically instructed to disregard it as to all defendants. In *Bruton*, the testimony was received into evidence, allowing the jury to weigh its credibility and impact for a limited purpose, but not allowing the incriminated defendant his constitutional right to impugn the source of the testimony through cross-examination. * * * "

*Cf.* Frazer v. Cupp, 394 U.S. 731, 89 S. Ct. 1420, 22 L.Ed.2d 684 (April 22, 1969).

"Not every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions * *." Bruton v. United States, 391 U.S. 123, at 135, 88 S.Ct. 1620, at 1627 (1968). Here, the statement did not identify defendant; the jury was told it inculpated none except Hajdu; and it was eventually stricken and the jury told it could not consider it at all. The nameless statement, stricken for all purposes with emphatic cautionary instructions, was not the type of "powerfully incriminating extrajudicial statement[s]", Bruton v. United States, *supra,* that demands a new trial.

We are not persuaded by defendant's arguments that Mosiello had already been identified as Gatto's boss, or that he physically appeared more like a boss than the others, or that the thrust of proof was toward Mosiello as boss alter the situation. In *Lipowitz* (Smith's Appeal), where "other fellows" were mentioned in the confession, Smith had already been identified as one of the three robbers. Nevertheless, the court said of Lipowitz's statement referring to "the other fellows", " * * * we can perceive no inculpation or implication whatsoever of Smith by Lipowitz's confession." The situation here is not qualitatively different.

Nor are we impressed with Mosiello's position that he was prejudiced because, he argues, only half the confession was offered. This is just not so. There were, in fact, two confessions; one named Gatto and the other did not. *Cf.* United States v. Lipowitz (Smith's Appeal), *supra,* footnote 17. We know of no rule that would give Mosiello standing to insist that the government present evidence which would certainly have caused a mistrial as to Gatto, Bruton v. United States, *supra,* and which, in any event, was inadmissible hearsay as to Mosiello.

Mosiello finally seems to argue as to Hajdu's statement that even though it was stricken with specific cautionary instructions, because of the fail-

ure to advise Hajdu that free counsel would be provided, he, Mosiello, was prejudiced by that failure. We think that *Miranda* rights are personal to the in-custody defendant. United States v. Minor, 398 F.2d 511 (C.A. 2, 1968). *Cf.* Tehan v. United States ex rel. Shott, 382 U.S. 406, 416, 86 S.Ct. 459, 15 L.Ed. 2d 453 (1966). But in any event, since the statement did not directly inculpate Mosiello, no prejudice to him resulted.

### B.

In his closing speech to the jury, the assistant United States Attorney punctuated his summary of the evidence in the following manner, referring to 148 Canal Street:

"* * * How about the siding business? Has anybody proven to you that there was a legitimate siding business going on there? Was there a legitimate business going on there or was that a front? * * *"

None of the defendants had taken the stand in his own behalf, nor had any of them put on a defense. Mosiello complains that the government's argument constituted adverse comment on the defendant's failure to testify, placing an unconstitutional burden on the exercise of his privilege against self-incrimination of the Fifth Amendment. Griffin v. California, 380 U.S. 609, 85 S.Ct. 1229, 14 L. Ed.2d 106 (1965); see also 18 U.S.C. § 1341.

 Whether or not the rule of Griffin v. California has been violated depends upon "whether the language used was manifestly intended to be or was of

such a character that the jury would naturally and necessarily take it to be a comment on the defendant's failure to testify." United States v. Lyon, 397 F.2d 505 (C.A. 7, 1968). If the line between the permissible and the impermissible in this area is not always clear, nevertheless where the intent and the effect of the statement is ambiguous, limiting instructions may suffice to cure any harm.[4] United States v. Nasta, 398 F.2d 283 (C.A. 2, 1968).

 Here, the language of the prosecutor was designed to call attention to the fact that the defense had failed to rebut the government's proof that the premises in question were being used for an illegal activity. It is not improper to comment on the failure to rebut prosecution evidence where the defendant is not the only person capable of providing such testimony. United States v. Lyon, *supra;* Garcia v. United States, 315 F.2d 133 (C.A. 5, 1963), cert. den. 375 U.S. 855, 84 S.Ct. 117, 11 L.Ed.2d 82 (1963). Although the defendants in this case could have testified on the subject of whether a legitimate siding business was being conducted, witnesses other than the defendants also could have so testified: employes, customers, suppliers, creditors, etc. Indeed, the proof could have rested on the proffer of certain documentary evidence: account books, sales receipts, insurance policies, etc. It was not to call attention to the defendants' failure to testify, then, but to their failure to offer proof that this comment was directed. See Knowles v. United States, 224 F.2d 168 (C.A. 10, 1955).

4. The court here instructed the jury:
"There is one thing that I would like to mention to you in considering the proof of the Government. The burden of proof rests entirely on the Government. There is no obligation on the defendant or defendants to produce any evidence or any testimony. The defendants have a perfect right to demand that the Government sustain its burden of proof beyond a reasonable doubt and to produce no evidence themselves. They have a perfect right, a constitutional right not to take the stand or to testify.

"Here again I wish to emphasize that you may draw no inference whatsoever from the exercise, by these defendants, of their constitutional right. Again I say this is not a technicality. This is far and away above and far more important and far more transcending than a technicality. It is something that is embedded in our Bill of Rights and if any one of you should either think or express the thought that because these defendants did not take the stand you may hold that against them, again you would be violating your oaths as jurors."

**704**

Thus, language far stronger than that here used was approved in United States v. Johnson, 337 F.2d 180 (C.A. 4, 1964), aff'd 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed. 2d 681 (1966):

"Members of the Jury, the defendant Edlin has presented no defense in this case. He has presented no evidence to contradict the charges against him. He has produced no evidence to deny numerous statements made by many, many government witnesses. He has produced no evidence to deny the testimony of numerous witnesses of his various activities which clearly indicate beyond any doubt, Members of the Jury, his guilt of the charges in this indictment."

We conclude that in light of the instructions given the jury it was not error to deny the defendant's motion for a mistrial.

### ORDER

And now, this 9th day of May 1969, it is ordered that the defendant Mario Mosiello's motions for judgment of acquittal or, in the alternative, for a new trial be and they hereby are denied.