**UNITED STATES of America**

v.

**Rocco FRUMENTO et al.**

**Rocco Frumento, Movant, et al.**

**Crim. No. 75–322.**

United States District Court, E. D. Pennsylvania.

Dec. 9, 1976.

Pennsylvania Department of Revenue's Bureau of Cigarette and Beverage Taxes ("Bureau"),[1] were each convicted by a jury of one count of violating 18 U.S.C. § 1962(c).[2] The convictions were based upon their acceptance of bribes during the pendency of a conspiracy to smuggle cigarettes into Pennsylvania for resale without payment of the Pennsylvania cigarette tax. Along with defendant John Sills, Frumento and Millhouse were also convicted of conspiring to commit that substantive offense, in violation of 18 U.S.C. § 1962(d). During the time this conspiracy existed, Sills was the aide to the chairman of the Philadelphia Democratic City Committee in charge of patronage. Frumento, Millhouse and Sills were also each found guilty by the jury of fraud and false statement in the making and subscribing of income tax returns for the calendar years 1971 and 1972, in violation of 26 U.S.C. § 7206(1), due to their failure to include the earnings from the cigarette smuggling operation in their taxable income.[3] Each defendant has filed a motion for judgment of acquittal or a new trial. For the reasons stated below, we will deny all of the motions.[4]

Robert E. J. Curran, U. S. Atty., Alan M. Lieberman and Joseph M. Fioravanti, Asst. U. S. Attys., Philadelphia, Pa., for plaintiff.

A. Martin Herring, Edward Weis, Richard G. Phillips, Philadelphia, Pa., for defendants.

## MEMORANDUM

BECHTLE, District Judge.

 Defendants Rocco Frumento and Andrew Millhouse, former employees of the

### The "Enterprise" Issue

 In our pretrial Orders of March 1, 1976, we rejected defendants' contention

1. During the period of time with which the indictment in this case was primarily concerned, June of 1971 through mid-March of 1972, Millhouse was the supervisor of the Bureau's District 2 office, which had within its jurisdiction the geographic area comprised of Philadelphia and its four surrounding counties. The supervisor was the administrative officer with direct control over all of the investigators within the District. During this same period, Frumento was appointed and served as a field investigator assigned to the District 2 office.

2. 18 U.S.C. § 1962(c) provides:

 (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

3. The substantive count, conspiracy count and six counts of tax fraud for which these defendants stood trial were part of an eleven-count indictment charging a total of five defendants. Due to the prior granting of severances, the other two defendants were tried individually.

4. At the conclusion of the trial, the Court denied all three defendants' motions for judgment of acquittal. [N.T. 13–18.] Since the jury returned a guilty verdict, we were obliged to examine the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the Government. *United States v. Trotter*, 529 F.2d 806, 810 (3d Cir. 1976). After examination of the notes of testimony, we are no less persuaded that there was sufficient evidence to permit the jury to properly find guilt

that the Bureau, as a government agency, is not an "enterprise" covered by the prohibitions of 18 U.S.C. § 1962(c). We relied on our previous discussion of this issue set forth at 405 F.Supp. 23, 29–30 (E.D.Pa. 1975). Citing the subsequent decision in *United States v. Mandel*, 415 F.Supp. 997 (D.Md.1976), wherein it was held that the State of Maryland does not qualify as a statutory "enterprise," defendants have again raised the issue.[5] We remain unpersuaded that our original decision was erroneous and, thus, again reject defendants' argument.

Congress gave the term "enterprise" a very broad meaning. *United States v. Morris*, 532 F.2d 436, 441–442 (5th Cir. 1976); *United States v. Hawes*, 529 F.2d 472, 479 (5th Cir. 1976). The term is defined as including "*any* individual, partnership, corporation, association, or other *legal entity*, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4) (emphasis added). Congress not only did not include any language limiting its definition of "enterprise" to private concerns, but specifically instructed that the provisions of Title IX of the Organized Crime Control Act of 1970 (18 U.S.C. § 1961 *et seq.*) "shall be liberally construed to effectuate its remedial purposes." Pub.L.No. 91–452, § 904(a).

The legislative history of Title IX demonstrates that its prohibitions were intended to rid the American economy of the influences of racketeering activity. The corruption of employees of a state agency, the activities of which affect interstate commerce, can be just as damaging to our system of free enterprise as the operation of an interstate business by unlawful racketeering methods. Construing 18 U.S.C. § 1962(c) to include within its coverage governmental agencies, such as the Bureau, is directly consistent with the congressional intent "to attack and to mitigate the effects of racketeer infiltration of legitimate *organizations affecting interstate commerce.* . . ." 116 Cong.Rec. 585 (1970) (remarks of Senator McClellan) (emphasis added).

■ Recent decisions have held illegal gambling operations to be enterprises within the purview of Section 1962(c). *United States v. Altese*, 542 F.2d 104 (2d Cir. 1976), *petition for cert. filed sub nom. Napoli v. United States*, 45 U.S.L.W. 3315 (U.S. Sept. 18, 1976) (No. 76–406); *United States v. Morris, supra; United States v. Hawes, supra; United States v. Cappetto*, 502 F.2d 1351 (7th Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). The expansive interpretation of "enterprise" adopted in those cases reinforces our view that Section 1962 was not designed solely to eliminate the infiltration of legitimate businesses and unions but, rather, was intended to eradicate patterns of racketeering activity contaminating any organization engaged in or affecting interstate commerce. Moreover, in those cases, the application of Section 1962 was not viewed as an unwarranted intrusion into traditional federal-state relationships. Similarly, we are not convinced that persistent corruption in

---

established beyond a reasonable doubt as to each count against each defendant. We will review the evidence here only to the extent made necessary by our discussion of specific issues.

The Court's Orders of March 1, 1976, denied these defendants' motions to dismiss the indictment based upon double jeopardy and collateral estoppel grounds. We held that this federal prosecution was not barred by defendants' prior acquittals in state court of similar charges growing out of the same alleged activity. We reaffirm that decision here, relying upon our previous discussion of the issue in *United States v. Frumento*, 409 F.Supp. 136, 139–140 (E.D.Pa.1976).

5. Defendants improperly designated this argument as a ground for a judgment of acquittal pursuant to Fed.R.Crim.P. 29. The sole foundation upon which a judgment of acquittal should be based is a successful challenge to the sufficiency of the Government's evidence. *United States v. Rivers*, 406 F.Supp. 709, 711 n.1 (E.D.Pa.1975), *aff'd mem.*, 544 F.2d 513 (3d Cir. 1976). The "enterprise" argument actually constitutes a motion for arrest of judgment, pursuant to Rule 34 of the Federal Rules of Criminal Procedure, and this Court shall treat it accordingly. The Court also notes that this argument, if correct, would have no bearing on defendants' convictions on the tax counts.

a state agency which has an effect on interstate commerce is simply a matter of local concern which Congress had no proper interest in seeking to regulate through this federal legislation.

Accordingly, for the reasons expressed here and in our above-cited earlier Opinion, we believe the jury was properly instructed that the Bureau is an "enterprise" within the coverage of 18 U.S.C. § 1962(c).

■■ The Court also believes that there was no variance between the indictment and the Government's proof concerning the relevant "enterprise." The theory of the Government's case was that Frumento and Millhouse, as officials of the Bureau, conducted the affairs of the Bureau through a pattern of racketeering activity, i. e., the solicitation and acceptance of bribes from Harold Sharp, unindicted coconspirator and operator of Sharp Candy and Tobacco Company, the cigarette wholesaling business which served as the outlet for the smuggled cigarettes. At trial, the Government produced witnesses who testified regarding the function of the Bureau [6] and its employees, and witnesses who testified concerning the official capacities of defendants Frumento and Millhouse within the Bureau. Other Government witnesses testified about payments made to Frumento and Millhouse in their official capacities which resulted in their protecting, promoting and facilitating

Sharp's illegal cigarette wholesaling business. These payments to Frumento and Millhouse, designed to influence their official conduct as employees of the Commonwealth, were acts of bribery under Pennsylvania law. The Government never suggested at trial, either by proof or argument, that there was any enterprise other than the Bureau upon which this prosecution was based. The Government's pleading and proof were in conformity.

### Evidence of Other Bribes

■ Subsequent to the return of the indictment in this case, the Government developed evidence that, during the period of time in which the Sharp conspiracy was operating, Frumento and Millhouse were also being paid bribes by other cigarette smugglers. [N.T. 2–8.] Defendants vigorously opposed the introduction at trial of testimony concerning these other bribes.[7] The Court allowed the testimony, pursuant to Federal Rule of Evidence 404(b), as proof of motive, opportunity, intent, plan, knowledge and absence of mistake or accident on the part of Frumento and Millhouse as regards their participation in the Sharp conspiracy. [N.T. 7–144, 10–2, 10–11.] However, the Court ruled that the jurors would not be permitted to find the substantive acts of racketeering charged against Frumento and Millhouse established unless they

---

**6.** The Bureau is the arm of the Pennsylvania Department of Revenue entrusted with fulfilling the Department's statutory duty to collect the tax imposed by law upon the sale of cigarettes within the Commonwealth. [N.T. 2–24, 10–93.] The Government's evidence was clearly sufficient to establish that the activities of the Bureau affect interstate commerce. All cigarettes consumed in Pennsylvania are produced in other states. [N.T. 2–24.] The Commonwealth licenses cigarette stamping agents, who buy directly from the out-of-state manufacturers and are responsible for affixing Pennsylvania tax stamps on the cigarette packages and remitting the proper tax to the Commonwealth. [N.T. 2–25.] Pennsylvania law requires that records be kept of the inventory of cigarettes brought into the Commonwealth and prohibits the possession or sale of cigarette packages which do not bear genuine Pennsylvania cigarette tax stamps. [N.T. 2–27, 2–28.] Through its licensing function, the Bureau reg-

ulates and controls the legitimate points of entry for cigarettes into Pennsylvania from foreign states. The Bureau's agents are also responsible for preventing the illegal entry of contraband cigarettes into Pennsylvania by arresting any individuals who attempt to smuggle [N.T. 2–29] and, in their official capacity, at times travel to other states in furtherance of this objective. [N.T. 7–159 to 7–160.] We believe this evidence of the Bureau's supervision over the entry of cigarettes into Pennsylvania demonstrates the requisite effect on interstate commerce of its activities.

**7.** As will be discussed, this testimony was variously admitted against only Millhouse or against only Frumento. While none of this evidence was admitted against Sills, he also challenged its admissibility on the ground that he would be unduly prejudiced by its introduction.

believed that payments had been received by Frumento and Millhouse from the Sharp operation. To the extent that the jurors accepted as true the evidence of acts of bribery unrelated to the Sharp scheme, they were instructed that these acts could not be considered as constituting the pattern of racketeering activity necessary to convict under 18 U.S.C. § 1962(c). [N.T. 12–112 to 12–113.]

Testimony concerning the other bribes came from three witnesses. LeRoy Wade, unindicted coconspirator in the Sharp scheme, was a field investigator assigned to the Bureau's District 2 office during the period in question. He frequently worked together with Frumento. Wade testified that, in January, 1972, Millhouse showed him a box full of cash and offered to let him have the "Coccia thing." Shortly thereafter, Wade testified, he and Frumento began to receive payments totalling $600 per month from Ernest Coccia, who was engaged in illegal cigarette smuggling in the Philadelphia area.

Coccia testified that, in December, 1971, he met with Millhouse and James Bushey and arranged to smuggle cigarettes into Pennsylvania. In return for protection from Bureau interference in the District 2 area, Coccia agreed to pay Millhouse $150 per week. Millhouse told Coccia that someone else would pick up the money. Approximately a week later, with Millhouse's approval, Frumento and Wade came to Coccia 'to receive the money. At that time, and every two weeks thereafter until sometime in February, 1972, Coccia paid Frumento and Wade $300 pursuant to his arrangement with Millhouse.

Bushey testified that he met with Millhouse in the spring of 1971 and informed Millhouse that he was setting up a wholesale cigarette operation in North Carolina from which he intended to sell to individuals engaged in illegal dealing in Pennsylvania. Millhouse agreed to provide protection to dealers buying from Bushey for a fee to be determined by the amount of volume being brought in by each smuggler. There-

after, during the fall and winter of 1971, Bushey made several payments to Millhouse on behalf of two of his customers, Ernest Coccia and Robert Cariola, who were engaged in cigarette smuggling.

The rule concerning the admissibility of evidence of similar acts is well-established in this Circuit. In *United States v. Stirone*, 262 F.2d 571, 576 (3d Cir. 1958), *rev'd on other grounds*, 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960), it was stated as follows:

> Evidence of other offenses may be received if relevant for any purpose other than to show a mere propensity or disposition on the part of the defendant to commit the crime.

Evidence of similar acts is frequently admitted to prove some aspect of the offense charged, such as intent or the absence of mistake or accident. *Andresen v. Maryland*, 427 U.S. 463, 483, 96 S.Ct. 2737, 2750, 49 L.Ed.2d 627 (1976); *United States v. Cook*, 538 F.2d 1000, 1004 (3d Cir. 1976); *see* Fed.R.Evid. 404(b).

The Court believes this testimony was properly admitted under the applicable rules of law. It was relevant to far more than simply the propensity of Frumento and Millhouse to commit crime. It highlighted the cooperative relationship which existed during the time period of the Sharp conspiracy between Millhouse, Frumento and Wade, three of the alleged coconspirators in the Sharp operation. It also helped to establish that these individuals were knowingly permitting illegal cigarette businesses to function within District 2 and were intentionally permitting the smuggling in return for payments constituting bribes. It tended to confirm that, in their official positions, they had the opportunity to engage in such illegal arrangements and that their participation in the Sharp operation was not a mistake or accident.

This Court also does not believe that the probative value of this evidence was "*substantially* outweighed by the risk that its admission [would] create a *substantial* dan-

ger of *undue* prejudice." [8] *United States v. Stirone, supra* at 576–577 (emphasis added); *see* Fed.R.Evid. 403. *Compare United States v. Cook, supra.* The jury was instructed several times as to the limited purpose for which this testimony was admitted. [N.T. 10–24 to 10–26, 10–31 to 10–32, 10–66, 12–112 to 12–113.] Moreover, the jury was repeatedly cautioned as to the particular defendant against whom the testimony could be considered. [N.T. 7–150, 7–152 to 7–153, 10–25 to 10–26, 10–31 to 10–32, 10–38 to 10–39, 10–41, 10–47 to 10–48, 10–66, 12–112 to 12–113.] We believe these measures were quite adequate to protect against any misuse of this evidence by the jury.

### Evidence of Purchase of Home in Margate, New Jersey

The Court permitted Harold Sharp to testify that, at Frumento's request, he placed a $2,700 down payment on a home in Margate, New Jersey, in early March, 1972, and, along with his wife, signed an agreement of sale for the property although neither he nor his wife had ever seen it. Sharp testified that while the house was to belong to Frumento, Frumento did not want it titled in his own name as suspicions might be raised by his paying it off as quickly as he planned on a state employee's salary. Frumento promised to repay Sharp the $2,700 out of his earnings from the cigarette smuggling conspiracy. On cross-examination, Sharp stated the mortgage payments on the Margate home were going to be paid by Frumento.

The Government also offered the testimony of Fred Campo, the Margate real estate salesman who handled the sale, and Mary Sharp, Harold's wife, as further evidence of this transaction. Campo testified that he showed Frumento the Margate property in January, 1972. Approximately March 1, 1972, Frumento telephoned Campo and told him that the Sharps would buy the property and that he should take an agreement of

sale up to their home. Campo stated that he had never shown the Sharps the property and had never been contacted by the Sharps concerning the property. However, on Frumento's instructions, he went to the Sharps' home and they signed the agreement of sale and gave him a check for the $2,700 down payment, which was ten percent of the total purchase price. Mary Sharp confirmed that she wrote the down payment check and signed the agreement of sale, although she had never seen the property. She also testified that, after signing the agreement, she telephoned Frumento, at her husband's request, and informed him of the signing and that Frumento then thanked her.

Defense counsel made objections to all of this testimony prior to its admission. Based upon the Government's offer of proof, which was consistent with the subsequent testimony, the Court overruled the objections to Harold Sharp's testimony. The reason for the Court's ruling was that this "unusual real estate transaction" allegedly occurred during the course of the conspiracy and "could be deemed to be a payment exacted from Sharp by one of the coconspirators." [N.T. 4–55.] The Court did not give the jury any limiting instructions at the time Harold Sharp testified concerning this evidence. During the testimony of Fred Campo and Mary Sharp, however, the Court gave clear instructions to the jury that their testimony concerning the Margate property could only be considered against Frumento and not against Millhouse or Sills. [N.T. 7–37 to 7–38, 9–125 to 9–126.] These limiting instructions were given not because the arrangements between Sharp and Frumento concerning the Margate home were irrelevant to the charges in the indictment, but rather because these arrangements were not in furtherance of the cigarette smuggling conspiracy. This was a collateral arrangement

8. In contesting the admissibility of this evidence, Sills argued that its prejudicial impact would necessarily "spill over" against him. Although we continue to believe that this prejudice, if any, was insufficient to require the exclusion of this evidence, whether it entitled Sills to a severance from Frumento and Millhouse is a separate issue which we will consider later.

as to the form Sharp's payments to Frumento from the smuggling operation would take. Accordingly, as against Millhouse and Sills, this Court considered the evidence inadmissible. *See* Fed.R.Evid. 801(d)(2)(E).

The Court expanded its ruling on the limited extent to which this evidence was to be considered in its final instructions to the jury. The jury was charged that *all* of the testimony concerning the Margate real estate transaction, including that of "Mr. Campo and Mr. and Mrs. Sharp," was only to be considered in support of the allegations against Frumento. [N.T. 12–111 to 12–112.]

This Court believes that it properly and sufficiently instructed the jury that this evidence was only admissible against Frumento. The arrangement was very similar in nature to the one testified to by Sharp, without objection, involving an $8,000 loan to Frumento at the very outset of the conspiracy for the purchase of a new Cadillac. [N.T. 3–126 to 3–130.] In both cases, the loan was to be repaid by Frumento from the payments accruing to him from the operation of the cigarette smuggling conspiracy. In each case, the jury could properly conclude that the loan was a form of bribe accepted by Frumento in lieu of a direct cash payment. The Margate home evidence was admitted against Frumento only and was plainly relevant to the charges pending against him,[9] both as proof of his receipt of bribes and as corroboration of his relationship with and, more specifically, control over Sharp in the context of the cigarette smuggling conspiracy.

### Settled Hatred and Apprehension of the Jury

On the second day of trial, based upon the likelihood of extensive press coverage of events in the courtroom conducted out of the presence of the jury, counsel for all three defendants requested that the jury be sequestered until the verdict was rendered. [N.T. 2–109 to 2–110.] The motion, unopposed by the Government, was granted by the Court and the jurors were informed that, "having consulted with counsel," the Court was convinced that it was necessary for them to be sequestered for the duration of the trial. [N.T. 2–146 to 2–147.] After the jury left for the day, Government counsel complained to the Court about an audible comment allegedly made by defendant Frumento during the testimony of a Government witness. The Court asked defense counsel to remind their clients to discipline themselves and to try not to make any facial gestures or remarks that could affect the jury's ability to decide the case fairly. [N.T. 2–151.]

On the fifth day of trial, one of the Deputy United States Marshals supervising the sequestration of the jury reported that one of the women on the jury had commented to him that defendant Frumento seemed to always be staring at the jury. Another female juror was present and overheard the comment, but made no remark herself. [N.T. 5–165 to 5–167.] The Court denied defense motions for a mistrial and instructed the Deputy Marshal to attempt to identify the two jurors present when the remark was made. Based on this identification, the Court had juror Elaine Blecker brought into chambers, with all counsel present, to question her about the matter. While juror Blecker did not recall making the comment, she acknowledged that several of the jurors, including herself, had felt that Frumento was staring at them. She identified the other affected jurors as the ones seated on either side of her and one of the alternates. She stated that she had since concluded that it was due to the loca-

---

**9.** In this respect, Frumento was the beneficiary of an error by the Court in his favor. In the final instructions, the Court charged the jury that the Margate home evidence could be considered against Frumento on the substantive racketeering count or the conspiracy count, but that "that real estate transaction would have no bearing at all even against Mr. Frumento in the tax counts. . . ." [N.T. 12–112.] This instruction was incorrect since, if the jury considered the transaction a bribe to Frumento, the $2,700 down payment could have been considered as unreported income on Frumento's 1972 income tax return. Since the mistaken instruction worked to Frumento's advantage, the Court considers it harmless error.

tion of her seat that Frumento seemed to be staring and that this feeling would not affect her ability to follow the Court's instructions and decide the case fairly. [N.T. 5–183 to 5–186.]

The Court then individually questioned the two jurors seated on either side of juror Blecker. Leeta Marsden admitted that she had discussed the matter, but stated to the Court that she had no fear at all and that the feeling would not affect her ability to serve on the jury. [N.T. 5–188 to 5–190.] Dorothy Paul stated that she had discussed the feeling with Elaine Blecker and admitted that she was uncomfortable about it. She stated that none of the other jurors had said anything to her about this observation. [N.T. 5–193 to 5–198.] The Court did not question the identified alternate, Elizabeth Weist, or any of the other jurors.

Based upon the interviews conducted, the Court denied the renewed defense motions for mistrial. The Court concluded that the initial concern of jurors Blecker and Marsden was "completely dispelled" and that this was no longer a problem in their minds. The Court also believed that the concerns expressed by juror Paul had been sufficiently satisfied in her own mind. However, "out of an extreme abundance of caution," the Court decided to have one of the four alternates replace juror Paul on the jury. This action was taken, the Court stated, because "I do think that observing her that this anxiety could return." [N.T. 5–200 to 5–201.] Juror Paul was then released from further duty and, the following trial day, first alternate Joyce Haywardo took her seat and served on the panel for the duration of the trial. At the time the replacement occurred, the Court reminded the jury that "your decision in this case should be based only on the evidence that you hear and the instructions of the court and not other collateral matters." [N.T. 6–8.] This instruction was repeated in an expanded form in the Court's charge. [N.T. 12–118 to 12–119, 12–123.]

Defendants Frumento and Sills now seek a new trial on the ground that this incident raises doubts that they were judged by a constitutionally-mandated "impartial jury." Unquestionably, the Sixth Amendment guarantees to a defendant the right to be tried by a jury with an attitude of "appropriate indifference." *United States v. Wood*, 299 U.S. 123, 145–146, 57 S.Ct. 177, 81 L.Ed. 78 (1936). While there is no precise test by which to ascertain the jury's state of mind, the constitutional standard is clearly breached by a jury which is influenced by fear or prejudice concerning a defendant. In such a case, the granting of relief is proper.

In *Taylor v. United States*, 386 F.Supp. 132, 139–140 (E.D.Pa.1974), *aff'd mem.*, 521 F.2d 1399 (3d Cir. 1975), Judge Becker described the type of findings which would justify the granting of relief as follows:

In examining claims of partiality on the part of a juror, courts have reversed convictions and provided a new trial in only two types of situations. First, if on voir dire, during trial or on post-trial motions, it becomes apparent that the challenged juror possessed at the time of trial a so-called "actual bias" that influenced his judgment of the case, any conviction will be reversed. In addition, there are those instances in which (in the words of Chief Justice Marshall) a person "may declare that he feels no prejudice in the case; and yet the law cautiously incapacitates him from serving on the jury because it suspects prejudice because in general persons in a similar situation would feel prejudice." 25 Fed.Cas. at 50, 1 Burr's Trial 414.

We believe that neither the actual nor implied bias theories is applicable in this case.

The Court's questioning of jurors Blecker and Marsden satisfied it that their judgment would not be affected by any actual prejudice against any of the defendants. Juror Paul and alternate Weist did not participate in the deliberations of the jury. No other members of the jury were identified as manifesting any concern over this matter. At trial, all defendants objected to any questioning of the jurors concerning this matter. [N.T. 5–162 to 5–165.] The Court believes its limited voir dire of the three

specifically identified jurors was proper, in light of the speculative nature of the possibility of actual bias, and that the necessity for further interviews was not indicated by the responses of those jurors.

This is also not a situation in which bias should be implied. We do not consider it an uncommon occurrence when a defendant looks at jurors intently during the course of a criminal trial. Nor do we doubt that many jurors feel self-conscious when so scrutinized by the individual whose guilt or innocence they are asked to judge. If this phenomenon were enough to raise a presumption of prejudice, it would be extremely difficult to conduct jury trials in their present form. Nor do we believe the sequestered status of this jury is of any significance. Frumento's contention that the sequestration order was viewed by the jurors as arranged by the Government for their protection from the defendants is totally without foundation. The jury was informed that the Court had determined sequestration was necessary after consultation with all counsel. Moreover, there was no mention by any of the three jurors interviewed that their sudden sequestration had raised fears in them concerning the defendants. We do not believe that any implication of jury prejudice or fear influencing the verdict would be justified in this case.

### Wade Testimony About the Sills-Millhouse-Frumento Meeting

Unindicted coconspirator Wade testified that sometime during the month preceding the arrest of Harold Sharp on March 13, 1972, there was a meeting held at Democratic City Committee headquarters between Sills, Millhouse and Frumento. After the meeting, Millhouse and Frumento joined Wade in an automobile. Wade's testimony continued: "I asked him what happened and Andy [Millhouse] told me that John Sills told him that the chairman said, 'Just get out of the cigarette business.'" [N.T. 8–43.] The "chairman" referred to in Wade's testimony was the head of the Democratic City Committee, the local party organization in Philadelphia.

Defendants argue that the admission of this testimony by Wade was erroneous both on the grounds that it was hearsay and that its probative value was outweighed by its potential for undue prejudice. We disagree.

Initially, we note that the Government offered the testimony as evidence of information being passed along by Sills to his alleged coconspirators, while the conspiracy was in progress, for the purpose of avoiding detection. [N.T. 8–39, 8–46.] The evidence was intended to demonstrate that Sills had an interest in alerting Frumento and Millhouse to the possibility that an investigation into the activities of the conspiracy was underway. It would thus be corroborative of the existence of the conspiracy and of Sills' knowledge of, and confederation with, its members.

■■■■ While the testimony to which objection was made has the appearance of triple hearsay, several basic evidentiary propositions belie this notion. Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted. *Anderson v. United States*, 417 U.S. 211, 219, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1974). Evidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement. *Id.* at 220 n. 8, 94 S.Ct. 2253. Finally, a well-recognized exception to the hearsay rule permits the introduction of out-of-court declarations of one conspirator against another if the declaration was made during the course of and in furtherance of the conspiracy charged. *Id.* at 218, 94 S.Ct. 2253.

■■■■ As regards the testimony in question, only the statement by Millhouse to Wade was offered to prove the truth of its content. Sills' statement was offered not for its truth but only for the fact that it was made by Sills. The chairman's statement was simply contained within the statement of Sills and was offered only as having been made. Thus, only the statement of Millhouse was actually hearsay when related to the jury by Wade, but it

was admissible under the exception for co-conspirator declarations. *See* Fed.R.Evid. 801(d)(2)(E). The Court's ruling at trial was consistent with this analysis. The Court admitted only the Millhouse statement to Wade to prove the truth of its content. The other statements referred to in Millhouse's statement were simply received to prove that they were made.[10] [N.T. 8–46.]

■ The Court's suggestion that cautionary instructions be given to the jury concerning the basis upon which the testimony was being received [N.T. 8–46] was rejected by defense counsel. Their position was that only a mistrial would cure the prejudice resulting from the jury's hearing of this testimony. [N.T. 8–48.] Believing a mistrial unjustified, the Court simply let the testimony stand without further comment to the jury. The evidence of Sills' statement to Millhouse was clearly relevant to the conspiracy charge contained in the indictment. It was a link in the chain of evidence connecting Sills to the cigarette smuggling scheme. The only question raised is whether the jury improperly used Wade's testimony and drew an inference from the alleged statement of the chairman to Sills that the chairman in fact knew that Sills and others were involved in cigarette smuggling. In light of all three defendants' opposition to cautionary instructions at the time the testimony was received and the subsequent exploration of this same area during the cross-examination of defendant Sills [N.T. 11–103 to 11–106], this Court does not believe the speculative misuse of Wade's testimony by the jury requires the granting of a new trial.

### Severance

Defendant Sills argues that the Court erred in not granting his motions for severance made both prior to and during the joint trial resulting in his conviction.

In a Memorandum reported at 409 F.Supp. 143 (E.D.Pa.1976), this Court fully explained its denial of Sills' pretrial motion for severance based upon the contention that a joint trial would deprive him of the opportunity to call codefendants Frumento and Millhouse and have their exculpatory evidence offered in his behalf. Our position remains unaltered after consideration of the subsequent decision in *United States v. Sica*, No. 75–2411 (3d Cir. Oct. 20, 1976), which we believe is factually distinguishable from the present case. In that case, the appellate court concluded that the exculpatory testimony of a codefendant which would have contradicted the version offered by the Government's sole witness of the sole meeting involving Sica might have produced a different verdict. The denial of his severance motion served to deprive Sica of the testimony of the one witness who could impeach the one Government witness upon whom the case against him depended. Accordingly, Sica's judgment of conviction was reversed.

■ The Government's case here against defendant Sills was not comparably thin. In addition to the testimony of unindicted coconspirators Sharp and Wade, there was undisputed corroborative evidence that Sills interceded on behalf of Frumento to obtain Frumento's appointment as an investigator for the Bureau, that Sills accompanied Sharp to Millhouse's office at the time Sharp applied for a cigarette stamping agent's license, that Sills received a $2,500 check from Sharp in January, 1972, and that Sharp, Frumento, Millhouse and Sills vacationed together in Puerto Rico in February, 1972. The inferences to be drawn from this corroborative evidence were hotly contested, but there is no question that the jury had much more evidence upon which to base a verdict against Sills than merely the testimony of the chief Government witness. We remain unconvinced that a severance was justified to permit Sills to call his codefendants as defense witnesses.

Sills also contends that a severance should have been granted due to the dispa-

---

10. The statement of Sills to Millhouse would also have been admissible to prove the truth of its content under the hearsay rule exception for coconspirator declarations.

rate quanta of evidence offered against Frumento and Millhouse as compared to him and the inability of limiting instructions to prevent the jury's improper use against him of evidence admitted only against Frumento or Millhouse. We disagree. In *United States v. Dansker,* 537 F.2d 40, 62 (3d Cir. 1976), *petitions for cert. filed sub nom. Valentine v. United States* and *Diaco v. United States,* 45 U.S.L.W. 3204–3205 (U.S. Aug. 5, 1976) (Nos. 76–158 and 76–159) and *Dansker v. United States,* 45 U.S.L.W. 3282 (U.S. Sept. 3, 1976) (No. 76–334), it was recently stated:

> A defendant is not entitled to a severance merely because the evidence against a codefendant is more damaging than that against him. If that were the case, a joint trial could rarely be held. Rather, in determining whether disparate proofs require a severance, the proper inquiry is whether the evidence is such that the jury cannot be expected to "compartmentalize" it and then consider it for its proper purposes. *United States v. DeLarosa,* 450 F.2d at 1065.

We do not believe that the jury in the instant case experienced any difficulty in "compartmentalizing" those few items of evidence which were admitted for only a limited purpose. That evidence consisted primarily of the testimony concerning the Margate home down payment made by Sharp for Frumento and the testimony concerning other bribes paid to Frumento and Millhouse outside the scope of the Sharp conspiracy.[11] All of this testimony has been discussed in greater detail in previous sections of this Memorandum. The evidence admitted for limited purposes was quite distinct from that concerning the general operation of the Sharp conspiracy and there was never any suggestion that either the Coccia-Bushey bribes or the Margate real estate transaction implicated Sills in the Sharp scheme. The jury should have had no problem in distinguishing this evidence from that properly admitted against Sills. Moreover, in light of our numerous instructions concerning the limited purpose for which this evidence was admitted, see citations, *supra,* we have no reason to believe that the jury nevertheless considered it against Sills.

### The Government's Closing Argument

Defendants complain of three remarks made during the course of the initial and rebuttal closing arguments of the Assistant United States Attorney which suggested deficiencies in the defense presentations.[12] We will consider each remark separately to determine whether it exceeded the bounds of proper prosecutorial comment.

During trial, the Government presented the testimony of Frank Criniti, a contractor who, between August of 1971 and January of 1972, remodeled portions of Frumento's home. Criniti testified that, during 1971, he received payments from Frumento by check amounting to $14,500 of the total project cost of approximately $24,000. On cross-examination, Criniti acknowledged that Frumento had requested a contract at the outset of the job in order to obtain a home improvement loan from a bank. However, Criniti stated that he did not know whether Frumento had ever obtained the bank loan. [N.T. 9–43.]

---

11. Sills also complains of evidence which was admitted against all defendants as relevant to establish the conspiracy charged, but which did not directly concern his alleged participation in it. There is no doubt that the Government's evidence more clearly enmeshed Frumento and Millhouse in the illegal scheme than Sills. However, the volume of evidence unrelated to Sills' participation in the Sharp conspiracy which was presented at trial was not so extraordinary as to conclude that he was prejudiced by its accumulation. Nor were the charges in the indictment so complex as to raise doubts about the jury's ability to separate the evidence against each defendant. The jury deliberated essentially on the issue of each defendant's participation in the Sharp cigarette smuggling operation. The Court charged the jury that it was to give separate and detailed consideration to the charges and evidence against each individual defendant. [N.T. 12–122.] We do not believe a separate trial was necessary to assure the proper consideration of the evidence against Sills.

12. It should be noted that, of the three defendants, Sills was the only one to testify at trial.

The prosecutor argued, in his initial summation, as follows:

Remember if Mr. Gabriel [Frumento's counsel] suggests to you that Frumento had a mortgage for the home improvements, remember he asked one question of Frank Criniti when he was on the stand: "Did Mr. Frumento ever tell you about a mortgage?"

Mr. Criniti, in his broken English, said, "I heard something about that from Mr. Frumento but I don't know."

*Do you think if there was a mortgage Mr. Gabriel would have presented it to you through bank records?* Don't let him argue that to you, ladies and gentlemen. [N.T. 12–56 (emphasis added).]

Defense counsel objected to this argument as an unfair invasion of Frumento's Fifth Amendment right to not have to present any defense. They also contended that the Government was misleading the jury, in light of the prosecutor's acknowledgment at side bar that there was a mortgage, not in evidence, that covered approximately one-fourth of the total expenditures of Frumento during this period.

■■■■ Prosecutorial remarks must be considered improper where the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify. *United States v. Dansker, supra,* 537 F.2d at 63. However, it is perfectly proper to comment on the failure of the defense to call a potentially helpful witness or proffer certain documentary evidence, at least where, as here, the remark could not be construed as a comment on the failure of the *defendant* to testify. *See United States v. Keller,* 512 F.2d 182, 186 (3d Cir. 1975); *United States v. Gatto,* 299 F.Supp. 697, 703–704 (E.D.Pa.1969). Evidence of a mortgage could have been easily introduced without the necessity of Frumento taking the stand in his own behalf. Moreover, the implication of the prosecutor's remark was that there was no mortgage which covered the full amount of Frumento's payments to Criniti, despite the suggestion raised by

Frumento's counsel on cross-examination of Criniti. Knowledge of the existence of a mortgage for a lesser amount does not, in our view, make the prosecutor's remark misleading. In light of the Court's instructions to the jury that defendants have no obligation to offer any evidence [N.T. 12–120 to 12–121], the Court believes there was no undue prejudice from this proper comment.

■■■■ The second allegedly improper remark by the Assistant United States Attorney was made in his initial argument while discussing the significance of a $2,500 check admittedly received by defendant Sills from Harold Sharp in early January, 1972. The prosecutor stated:

The only difference between Sharp's testimony and Sills' testimony is the purpose of the money. Mr. Sills said that it was a campaign contribution; Mr. Sharp says it was part of the proceeds of the cigarette smuggling.

Now, remember the testimony of Isadore Shrager called by defense counsel in this case. He is counsel to the Democratic City Committee. He said that if a cash contribution is made to Democratic City Committee, on cross-examination under questioning by Mr. Lieberman, that it must be reported. That's the law, the contribution, if it is a contribution, must be reported. That's the law. *Where is the record of that contribution?* [N.T. 12–63 (emphasis added).]

During his rebuttal argument, the prosecutor repeated the point:

The question is, was this a contribution or was this a pay-off by Sharp? And *if it was a contribution it had to be reported and if it was reported where is the record? Where is the record*—[N.T. 12–77 (emphasis added).]

The Court believes these comments were also proper. The Government had attempted to introduce, during its cross-examination of defendant Sills, the records of contributions made to the Philadelphia County Democratic Party during the relevant years. [N.T. 11–123.] They would reveal no record of any contribution by Harold

Sharp during 1971 and 1972. On the objection of counsel for Sills that the records offered were incomplete, the Court refused to permit their use. [N.T. 12–66.] Counsel for Sills also acknowledged, however, that the Government had in its possession all the available records. [N.T. 12–64.] Defense witness Shrager stated that if the $2,500 check from Harold Sharp was a contribution, it should have been recorded. [N.T. 11–40.] Since the required reference to a Sharp contribution did not appear in any of the records subpoenaed by the Government, we believe this was a fair comment on the state of the evidence. It simply called attention to the absence of any proof of a record which Sills' own defense witness had said should exist. The Court's subsequent instructions concerning the burden of proof insured that there was no improper prejudice from the comments.

The final statement objected to was made during the rebuttal argument of the Government. The evidence disclosed that several inaccuracies in the investigative report on Sharp's application for a cigarette stamping agent's license had eased his approval for that position. The final report was typed by Iris Freedman, who was Millhouse's secretary at the District 2 office. The question in dispute was whether or not Millhouse had supplied her with the false information contained in the report. The comment in question was as follows:

> Mr. Weis [counsel for Millhouse] told you that the information on this CSA investigation, typed up by Iris Freedman, was not supplied by Andrew Millhouse. Iris Freedman told you that it was supplied by Andrew Millhouse. I ask you, *if Mr. Millhouse did not give the information to type this and submit it to Harrisburg, where did she as his personal secretary get it?* [N.T. 12–72 (emphasis added).]

Viewed in the context in which it was made, the Court does not believe that this rhetorical question was either intended as a comment on the failure of Millhouse to testify in his own behalf or of such a nature that the jury would necessarily construe it in that fashion. It is doubtful to us that Millhouse would have been able to provide any better answer to that question than anyone else and we believe the jury would have reached a similar conclusion. In light of the Court's previously-cited charge, we do not believe the jury adversely considered Millhouse's failure to testify as a result of this comment.

Considered individually, or taken together, we do not believe that these isolated remarks in the prosecutor's lengthy closing argument produced any improper inference against defendants which requires the granting of a new trial.

### Conclusion

We have considered all of the other grounds raised for a new trial and find them to be without merit. Accordingly, all of defendants' motions will be denied.

This Memorandum is in support of the Court's Order in this case dated November 15, 1976.