**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**David K. MORRIS, Defendant-Appellant.**

**No. 75–2828.**

United States Court of Appeals,
Fifth Circuit.

May 27, 1976.

Ruben Montemayor, Harry A. Nass, Jr., Fred A. Semaan, Charles D. Butts, San Antonio, Tex., for defendant-appellant.

John E. Clark, U. S. Atty., Wayne F. Speck, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, GODBOLD and LIVELY*, Circuit Judges.

WISDOM, Circuit Judge:

David K. Morris was tried and convicted by a jury of six counts of interstate racketeering. The first count charged the appellant with engaging in an interstate enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c). The remaining counts[1] charged the appellant with five separate acts of interstate travel in aid of racketeering, in violation of 18 U.S.C. § 1952(a)(3). On appeal, he urges four grounds for reversing the verdict. We find none persuasive and affirm the judgment of the district court.

## I. PROCEEDINGS BELOW

At trial, the government presented evidence to show that Morris, along with Solomon Abdo and Charles Angellini, had planned and participated in rigged card games conducted on various occasions in Las Vegas and Lake Tahoe, Nevada. Both Abdo and Angellini testified that unsuspecting card players, "marks" in the jargon of the trade, were invited to participate in games conducted in Morris's hotel suite. Once there, the marks fell victim to the sleight-of-hand tricks of the defendant and his friendly card players, Abdo and Angellini. A favorite cheating method the trio employed was the use of a "cold deck", in which the cards were pre-arranged to deal certain poker hands to designated players. Frequently the victims were dealt hands which in ordinary circumstances seemed certain to win, only to find that another player, Morris or Abdo or Angellini, had been dealt a better hand.

Although Morris contended throughout the trial that he was unaware of any cheating, he conceded that "some fantastic hands" were dealt during these games. He and his colleagues must have excelled in finding naive, trusting, and afraid-to-make-a-fuss poker players. Five of the marks testified that on various occasions each of them had been dealt a full house; they were beaten by four of a kind. Another victim was dealt four jacks; he was beaten by four kings. Another was dealt a queen high flush; he was beaten by a king high flush. Still another was dealt a full house, with three jacks; he was beaten by a full house, with three aces. Eventually some of the marks made a fuss.

Invariably, Morris or Abdo or Angellini emerged with the most money. Regardless of who won however, the winnings were split three ways. Abdo testified that Morris received fifty percent and that Abdo himself received the rest, less Angellini's cut. Angellini testified that his usual cut varied from ten percent to thirty percent, but he was only a "shill".[2]

---

* Of the Sixth Circuit, sitting by designation.

1. The appellant was originally charged with six separate counts of violating 18 U.S.C. § 1952(a)(3). However, the government chose not to proceed on count 3 and the appellant's motion for acquittal as to this count was granted.

2. In professional gambling a "shill" is one who pretends to participate in the game like any other player, but who in fact, is betting some-

Morris admitted his participation in the games, and confirmed the testimony of several victims concerning the frequency of high hands dealt to the marks that just happened to be topped by higher hands dealt to Morris or Abdo or Angellini. He denied, however, that he had ever manipulated the cards and he disclaimed any knowledge of "cold decking" or other sleight-of-hand cheating techniques. He further denied ever receiving a share of the winnings from Abdo. The jury, probably to the surprise of no one, found his story incredible.

## II. DESIGNATION OF SPECIAL ATTORNEY

We are concerned here with alleged violation of express law, not morality. And citizens bitten by the gambling bug who choose to gamble in a hotel suite in Las Vegas are not wards of the court.

On appeal, Morris raises four grounds for reversing his conviction. The first rests on the allegedly improper designation of Justice Department Special Attorney Edward Weiner who presented evidence before the grand jury that indicted the appellant and who later assisted the United States Attorney at trial. Specifically, the appellant contends that the Attorney General's letter designating Mr. Weiner as a Special Attorney to assist in the conduct of the case was insufficiently explicit to comply with the requirements of 28 U.S.C. § 515(a); hence the indictment which he helped procure should be quashed and the conviction reversed. Similar challenges have been made and recently rejected by the Second, Seventh, and Eighth Circuits. *See In re Subpoena of Persico*, 2 Cir. 1975, 522 F.2d 41; *In re Di Bella*, 2 Cir. 1975, 518 F.2d 955; *United States v. Crispino*, 2 Cir. 1975, 517 F.2d 1395 (1975—reversing without published opinion, 392 F.Supp. 764); *Infelice v. United States* and *United States v. Dulski*, 7 Cir. 1975, 528 F.2d 204; *United States v.*

*Wrigley*, 8 Cir. 1975, 520 F.2d 362, petition for cert. pending; *United States v. Agrusa*, 8 Cir. 1975, 520 F.2d 370; *DiGirlomo v. United States*, 8 Cir. 1975, 520 F.2d 372; *see also United States v. Hall*, 9 Cir. 1944, 145 F.2d 781, *cert. denied*, 1945, 324 U.S. 871, 65 S.Ct. 1016, 89 L.Ed. 1425. A review of those cases and an independent examination of the statute lead us to agree with these recent decisions of other circuits and to reject the appellant's challenge.

Section 515(a) of Title 28 United States Code provides:

(a) The Attorney General or any other office of the Department of Justice, or any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal, including Grand Jury proceedings and proceedings before committing magistrates, which United States Attorneys are authorized by law to conduct, whether or not he is a resident of the District in which the proceeding is brought.

The letter from the Attorney General designating Mr. Weiner as a special attorney to assist the United States Attorney for the Western District of Texas in the instant case read as follows:

The Department is informed that there have occurred and are occurring in the Western District of Texas and other Judicial Districts in the United States violations of Federal Criminal Statutes by persons whose identities are unknown to the Department at this time.

As an attorney at law you are specially retained and appointed as a special attorney under the authority of the Department of Justice to assist in the trial of the aforesaid cases in the aforesaid District and other Judicial Districts of the United States in which the Government is interested. In that connection you are specially authorized and directed to file

---

one else's money. Angellini testified that Abdo would give him money to bet, thus providing the illusion that he, like the other "marks", was losing money in the game. For this service,

Angellini usually received ten percent of the winnings. His cut was increased, however, if he succeeded in procuring a new "mark" to participate in a game.

informations and to conduct in the aforesaid District and all other Judicial Districts of the United States any kind of legal proceedings, civil or criminal, including Grand Jury Proceedings and Proceedings before committing Magistrates, which United States Attorneys are authorized to conduct.

■ The appellant does not dispute the authority of the Attorney General to designate special attorneys in cases such as the one at bar with a more restrictive authorization. He alleges merely that the language of the letter in question is too broad to constitute a proper designation within the meaning of the statute. The question thus posed by the defendant is: assuming that the Attorney General could, with a more specific designation, have authorized Special Attorney Weiner to proceed in the instant case, was the letter in question sufficiently specific to do so? We hold that it was.

■ The appellant's primary objection to the letter of authorization is its failure to mention the specific federal statutes under which the indictment was sought. The appellant contends that by granting the special attorney such broad authority to investigate possible criminal activity in the designated district, the letter of authorization tends to invade the province of the United States Attorney in the Western District of Texas. A review of the statutory history of the act convinces us that this argument is without merit.

Section 515(a) was enacted in 1906 to counter the effect of *United States v. Rosenthal*, C.C.S.D.N.Y.1903, 121 F. 862, holding that the existing statutory power of the Attorney General to designate special attorneys or to assign officers of the Justice Department to conduct cases and legal proceedings did not extend to appearances before the grand jury. In its report favoring passage of the statute, the Judiciary Committee stated:

The purpose of this bill is to give to the Attorney General, or to any officer in his Department, or to any attorney specially employed by him, the same rights, powers and authority which district attorneys [United States Attorneys] now have or may hereafter have in presenting and conducting proceedings before a grand jury or committing magistrate.

House Report 2901 to accompany H.R. 17714, 59th Congress, 1st Session, pp. 1–2 (1906). The requirement that the special attorney be "specifically directed" by the Attorney General was designed to protect the interests of the United States. See *United States v. Powell*, E.D.Mo.1948, 81 F.Supp. 288, 291; *Shushan v. United States*, 5 Cir. 1941, 117 F.2d 110, 114, *cert. denied*, 1941, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531. Moreover, as the Eighth Circuit recently noted in *Wrigley, supra*, there is no reason to believe that the broad grant of authority to the Attorney General in any way impinges on the "independence" of the United States Attorneys. 520 F.2d at 368 n. 13.

Recognizing the purpose of the statute, courts have repeatedly refused to invalidate letters of designation which failed to state either the persons to be prosecuted or the statutes under which such prosecution was to be undertaken. See, e. g., *United States v. Amazon Industrial Chemical Corp.*, D.Md. 1931, 55 F.2d 254, 256–57; *United States v. Hall*, 9 Cir. 1944, 145 F.2d 781, *cert. denied*, 1945, 324 U.S. 871, 65 S.Ct. 1016, 89 L.Ed. 1425; *Shushan v. United States*, 5 Cir. 1941, 117 F.2d 110, *cert. denied*, 1941, 313 U.S. 574, 61 S.Ct. 1085, 85 L.Ed. 1531. As this Court stated in *Shushan, supra*, "[w]hen a grand jury, which is an inquisitorial body, begins an investigation it cannot be known in advance whom they will indict." 117 F.2d at 114. The same can be said of statutes which the government suspects have been violated. Only after a full investigation can the government know under which statutes it will choose to proceed.

Thus there is good reason to interpret § 515(a) broadly, in order to permit the Attorney General to designate special attorneys to investigate suspected criminal activity at an early stage of the proceedings. We find no reason, in either the legislative history or the policy underlying the statute,

to construe it to require specific mention of the parties or the statutes under which prosecution is anticipated.

Turning from the legislative history of the statute to the recent decisions construing it, we note that the letter quoted above is virtually identical to the letters of authorization challenged and ultimately upheld in *Crispino, Wrigley, Agrusa,* and *Dulski, supra.* In *Crispino,* the Second Circuit reversed without published opinion the decision of the lower court quashing the indictment for lack of proper authorization. In *Wrigley,* however, the Eighth Circuit gave an extensive explanation for its reversal of the lower court's decision dismissing the indictment. There too the appellant challenged the letter for its failure to specify the statutes under which the government's special attorney was to proceed. There too the court concluded after an examination of the legislative history and purpose of § 515(a), that, in light of the Attorney General's undeniable power to employ special attorneys to investigate the matters in question, no public policy would be promoted by a restrictive reading of the statute nor any rights of a defendant infringed by a broad interpretation of the section.[3] Thus, the court concluded, the statute should be read "not [as] a limitation but [as] a grant of authority that makes the powers of the Attorney General coextensive with his duties." (Citing cases) 520 F.2d at 368.

We agree with the court in *Wrigley* that "[n]othing would be gained by requiring the Attorney General to designate the type of case to be prosecuted by the special attorneys when there is no limitation to the scope of his authority." 520 F.2d at 369. As noted above, there is ample reason for construing the statute broadly. We therefore choose to follow the recent decisions of the Second, Seventh, and Eighth Circuits and the precedents of this Court in holding

the letter of designation in the instant case sufficiently specific to comply with the requirements of 28 U.S.C. § 515(a).

### III. SUFFICIENCY OF THE EVIDENCE

As a second basis for reversing his conviction, the appellant argues that the evidence was insufficient to sustain a verdict of guilty on any of the counts, and that the trial judge therefore committed reversible error by denying his motion for acquittal. Though the evidence was largely circumstantial and consistently disputed by the appellant, we find it sufficient to support the jury's verdict.

### A. 18 U.S.C. § 1962(c)

As noted above, the six counts under which the appellant was convicted fall into two categories: the first count, under 18 U.S.C. § 1962(c), charged the appellant with conducting an enterprise through a pattern of racketeering activity. The statute states:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The two crucial elements which the government must prove to sustain a conviction under § 1962 are the defendant's association with an "enterprise" and the existence of a "pattern of racketeering activity". 18 U.S.C. § 1961(4) defines "enterprise" to include any group of individuals associated in fact although not a legal entity. This Court has recently stated that "Congress gave the term 'enterprise' a very

---

**3.** In *United States v. Weiner,* N.D.Ill.1975, 392 F.Supp. 81, the court posed (and impliedly answered) the question:

> What constitutional rights were the defendants denied by [the special attorney's] appearance before the grand jury? What harm or disadvantage did the defendants suffer be-

cause of [his] presence? Would not the defendants be placed in the same position had the local United States Attorney appeared before the grand jury? Clearly defendants' motion is based on form and not substance. 392 F.Supp. at 89, quoted in *Infelice v. United States,* 7 Cir. 1975, 528 F.2d 204, 207.

broad meaning." *United States v. Hawes,* 5 Cir. 1976, 529 F.2d 472, at 479. The indictment in the instant case alleged the required "enterprise" by describing the appellant and his partners as "a group of individuals associated in fact to defraud in illegal card games persons who had travelled to the State of Nevada." The appellant did not deny travelling to Nevada with Abdo and Angellini, nor did he deny participating in the card games in question. The evidence that the card games were in fact rigged was not only sufficient but overwhelming, supported by the testimony of two of the alleged partners in the scheme as well as numerous victims of the fraud.

There was also ample evidence to support a finding of a "pattern of racketeering activity". 18 U.S.C. § 1961(1)(B) defines "racketeering activity" as any act which is indictable under 18 U.S.C. § 1952 (the statute forming the basis for the remaining five counts). Under 18 U.S.C. § 1961(5), at least two acts of "racketeering activity" are required to prove a "pattern" of such activity. The statute further requires that any second act forming the basis for a charge of a "pattern" be committed within ten years of the first act. As the Senate Committee Report on the Organized Crime Control Act of 1970 stated:

The concept of "pattern" is essential to the operation of the statute. One isolated "racketeering activity" was thought insufficient to trigger the remedies provided under the proposed chapter, largely because the net would be too large and the remedies disproportionate to the gravity of the offense. The target of Title IX is thus not sporadic activity.

S.Rep. 91–617, 91st Congress, 1st Sess. p. 158.

The separate offenses which formed the basis for the government's charge of a "pattern of racketeering activity" cannot be characterized as sporadic. The several card games occurred over a nineteen-month period (well within the ten-year limit set by the statute) and followed an easily recognizable pattern, including junkets to Nevada, private card games in the appellant's hotel suite, the presence of shills, and the use of a "cold deck" and other sleight-of-hand cheating techniques. Thus we conclude that the evidence of the various games which formed the basis for the charges in counts 2 and 4–7 was clearly sufficient to justify an inference that the appellant and his associates were jointly engaged in an "enterprise" characterized by a "pattern of racketeering activity" in violation of 18 U.S.C. § 1962(c).

### B. 18 U.S.C. § 1952(a)(3)

Counts 2 and 4–7 charged the appellant with interstate travel in aid of racketeering in violation of 18 U.S.C. § 1952(a)(3). The statute provides:

(a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to—

(3) Promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,

and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2) and (3) shall be fined not more than $10,000 or imprisoned for not more than five years, or both.

"Unlawful activity" is defined in § 1952(b) as "any business enterprise involving gambling . . . offenses in violation of the laws of the State in which they are committed".

[6] Morris first contends that his frequent interstate trips from his home in Texas to Nevada for the purpose of conducting private card games cannot validly form the basis for a prosecution under the statute because gambling is not an offense "in violation of the laws of the State" of Nevada. What the appellant fails to perceive, of course, is the distinction between legitimate legalized gambling, permitted in Nevada, and illegitimate or dishonest gambling, illegal in Nevada and every other state. *See United States v. Roselli,* 9 Cir. 1970, 432 F.2d 879, 887, *cert. denied sub nom. Teitelbaum v. United States,* 1971, 401 U.S. 924, 91 S.Ct. 883, 884, 27 L.Ed.2d 828,

*rehearing denied* 1971, 402 U.S. 924, 91 S.Ct. 1366, 28 L.Ed.2d 665; *see also Turf Center Inc. v. United States,* 9 Cir. 1961, 325 F.2d 793, 795. Section 465.070 of the Nevada Revised Statutes provides:

1. Every person who, by color, or aid of any trick or sleight-of-hand performance, or by any fraud or fraudulent scheme, cards, dice or device, shall win for himself or for another any money or property, or representative of either, shall be punished by imprisonment in the state prison for not less than 1 year nor more than 10 years, or by a fine of not more than $5,000, or by both fine and imprisonment.

2. Every person who shall entice or induce another, upon any pretense, to go to any place where any gambling game, scheme or device, or any trick, sleight-of-hand performance, fraud or fraudulent scheme, cards, dice or device is being conducted or operated; or while in such place shall entice or induce another to bet, wager or hazard any money or property . . . shall be punished by imprisonment in the state prison for not less than 1 year nor more than 10 years, or by a fine of not more than $5,000, or by both fine and imprisonment.

The undisputed testimony of Abdo and Angellini established that the games in which Morris participated were in fact rigged, thus bringing them within the proscription of the Nevada statute. As such, they were clearly "gambling offenses . . . in violation of the laws of the State" and were thus punishable under 18 U.S.C. § 1952(a)(3).

■ Also without merit is Morris's contention that the connection between his frequent trips to Nevada and the illegal card games was too tenuous to sustain a conviction under § 1952. As noted in our previous discussion, the evidence was sufficient to justify an inference that the appellant, Abdo, and Angellini made the several trips to Nevada as part of a scheme to cheat unsuspecting card players through the use of stacked decks and other cheating techniques. The decision in *United States v.*

*Hawthorne,* 4 Cir. 1966, 356 F.2d 740, holding that one trip to move the defendant's family which resulted in a gambling offense was not violative of § 1952, is not apposite. Here there was substantial evidence that the numerous trips to Nevada were specially designed to promote the illegal scheme, and thus clearly within the prohibition of § 1952.

■ Finally, we reject the appellant's contention that the evidence was insufficient to support a finding of intent necessary to sustain his conviction as an aider and abettor under § 1952. In any case where intent is a disputed issue, the evidence tending to prove such intent is necessarily circumstantial. The mere fact, however, that the appellant denied any knowledge of the illegal scheme did not preclude the jury's finding that he knowingly participated in it. The government's evidence, offered to prove intent, included undisputed testimony that the illegal games had taken place in Morris's hotel room and that he had participated in them. There was further evidence that he had arranged for people to be present at the games, had himself manipulated the cards, had used hand signals to communicate surreptitiously with his partners, and had accepted splits of the money won. If the jury believed this evidence, we cannot say that the jury's finding was unreasonable. *See Harper v. United States,* 5 Cir. 1969, 405 F.2d 185. In sum, we find no cause to reverse the conviction for lack of sufficient evidence as to any of the counts under either § 1962(c) or § 1952(a)(3).

## IV. EVIDENCE OF "JUICE JOINT"

As a third ground for reversing the conviction below, Morris assigns as error the trial judge's admission of evidence relating to a cheating device known as a "juice joint" once installed in the appellant's San Antonio home and offered to prove his knowledge of the illegal scheme and intent to promote it. This evidence, brought out on cross-examination by the government, the appellant contends was both irrelevant and prejudicial. We disagree.

In its case in chief, the government made no mention of Morris's connection with any illegal gambling schemes other than those charged in the indictment. He testified that he had no knowledge that the games were rigged and no way of knowing that Abdo would be manipulating the cards to cheat other players. On cross-examination, the government attempted to examine this contention further by asking about gambling games conducted with Abdo in the Morris home in San Antonio. When asked whether such games were straight or crooked, the defendant responded by mentioning that Abdo had once installed a "juice box" or "juice joint" in the appellant's home. A "juice joint" is a mechanical device which can be programmed to control the roll of dice. Though Morris testified that he thought the device was designed to "detect cheaters", contrary testimony was introduced that he was aware of the true use of the device and had on occasion operated the control button himself.

The appellant concedes that evidence of other crimes is admissible to prove criminal intent, provided that intent is an issue and that the other crimes sought to be shown are not too remote from the crimes charged. *United States v. Arteaga-Limones,* 5 Cir. 1976, 529 F.2d 1183, at 1196–97; *Weiss v. United States,* 5 Cir. 1941, 122 F.2d 675. He challenges the admissibility of the evidence in question, however, on two grounds. First, he contends that since the "juice joint" was installed in his home after the dates of two of the offenses charged (counts 2 and 4), it is irrelevant to prove intent as to those charges and hence prejudicial. Second, he contends that any knowledge he might have had that Abdo cheated at dice could bear no relevance to his supposed knowledge that Abdo cheated at cards. Both these contentions may be disposed of briefly.

First, we are aware of no rule of law declaring that in order to be admissible on one count of an indictment, evidence

must be relevant on all counts. Here the "juice joint" was installed before the three games forming the bases for counts 5, 6, and 7, and shortly after those forming the bases for counts 2 and 4. They were not too remote in time to be relevant on the issue of the appellant's knowledge of Abdo's illegal gambling schemes.

Nor is the fact that the illegal games in San Antonio involved dice rather than cards sufficient to remove the evidence from the realm of relevancy. The jury might reasonably have inferred that a man who controls the roll of the dice would cheat at cards. Thus if the jury used the "juice joint" evidence to conclude that Morris possessed the knowledge and intent necessary to sustain a conviction under § 1952, we cannot say such use of the evidence was improper. The trial judge committed no error in permitting the evidence on cross-examination.

## V. DENIAL OF ACCESS TO SEALED GRAND JURY TESTIMONY

As his final ground for reversing the conviction below, the appellant cites the trial judge's refusal to permit defense counsel to examine certain sealed portions of grand jury testimony which, after an *in camera* examination, the judge concluded were irrelevant to the defense. The portions had been deleted at the request of government attorneys who represented that such portions related to other potential defendants not then on trial and were immaterial to the appellant's trial. The sealed portions included testimony of Abdo, Angellini, and another grand jury witness who did not testify at the appellant's trial.[4] The trial judge's decision to delete the selected portions of the grand jury transcript was made only after the judge's own reading of the excerpts convinced him that they would be of no use to the defense.

The appellant contends that the trial judge's refusal to compel production of

---

**4.** The testimony of the other grand jury witness would have been relevant on count 3 of the indictment. As noted above, however, the government chose not to proceed on this count. *See* note 1 *supra.*

the sealed portions of grand jury testimony denied him due process, equal protection, the right to confront witnesses, and the effective assistance of counsel guaranteed by the Fifth and Sixth Amendments. This Court realizes the difficult position of a defendant who believes that he has been deprived of evidence relevant to his defense but who, for want of access to such evidence, is unable to specify in what way it would have proved helpful. In the instant case, however, this Court examined the sealed portions of deleted grand jury testimony. We agree with the trial judge's conclusion that none of the deleted testimony could have proved useful to the appellant. On the contrary, as the government suggests, much of the evidence would have damaged the defense.

We find that the trial judge's decision to delete certain portions of grand jury testimony before granting defense counsel access to the remainder of the transcript was within the area of permissible judicial discretion. Most of the testimony was irrelevant to the appellant's case, and what little portions were relevant could not possibly have tended to exonerate him. *Compare Brady v. Maryland*, 1963, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215. Defense counsel was given access to all relevant information, including F.B.I. reports, a bill of particulars, plea agreements, and immunity grants, thus ensuring the appellant the constitutional guarantees of a fair trial.

We conclude that there was no error in the proceedings below. The special attorney was properly designated under 28 U.S.C. § 515(a); the evidence was sufficient to sustain the conviction on all counts under both 18 U.S.C. § 1962(c) and § 1952(a)(3); the trial judge did not err in admitting evidence of the "juice joint" on the issue of intent, nor in refusing to permit defense counsel access to sealed grand jury testimony which was either irrelevant or damaging to the appellant's defense. For the above reasons, the judgment below is AFFIRMED.