UNITED STATES of America,
Plaintiff-Appellee,

v.

LEE STOLLER ENTERPRISES, INC.,
Lee Stoller, John M. Cooper, and John
Maeras, Defendants-Appellants.

Nos. 79–1632, 79–1633 and 80–1479.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 19, 1981.

Decided June 30, 1981.

Fairchild, Chief Judge, dissented in part and filed opinion.

Cudahy, Circuit Judge, dissented in part and filed opinion.

Swygert, Circuit Judge, filed dissenting statement and joined in part in the opinions of Fairchild, Chief Judge, and Cudahy, Circuit Judge.

* Circuit Judge Harlington Wood, Jr., has disqualified himself from participating in the consideration of this case.

Michael J. Costello, Springfield, Ill., H. Carl Runge, Collinsville, Ill., Bruce N. Cook, East St. Louis, Ill., for defendants-appellants.

Gerald D. Fines, U. S. Atty., Thomas W. Turner, John C. Carver, Asst. U. S. Attys., Springfield, Ill., S. Cass Weiland, Atty., U. S. Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before FAIRCHILD, Chief Judge, SWYGERT, CUMMINGS, PELL, SPRECHER, BAUER and CUDAHY, Circuit Judges.*

SPRECHER, Circuit Judge.

This appeal, from convictions on multiple counts of an indictment, presents issues arising from prosecutions under the Racketeer Influenced and Corrupt Organizations Statute ("RICO"); particularly whether a public entity, such as here the office of County Sheriff, can be a RICO "enterprise".

I

The defendant John Maeras was the Sheriff of Madison County, Illinois, from December, 1970, to December, 1978. The defendant John M. Cooper was a deputy sheriff for this entire period and was serving as a lieutenant and chief of field operations in November, 1978, when the indictment was returned. These defendants were charged with involvement in two broad corruption schemes.

The first aspect of corruption involved payoffs for prostitution and towing activities. Shortly after his inauguration as sheriff, Maeras discussed with his brother-in-law Pete Skundrich and his friend Ron Grzywacz [1] kickbacks which he knew deputies were receiving from towing companies and houses of prostitution within the county. He told them that he wanted the payoffs stopped and that any money should go to him and not the deputies. After a few days, Grzywacz and Skundrich agreed to visit various places on behalf of the sheriff and inform them that the payoffs were henceforth to be delivered to Grzywacz collecting for the sheriff and that no further payments were to be made to the deputies.

After the first such visit—to Trickey's Towing in Wood River, Illinois—Skundrich was replaced by defendant Cooper who Maeras and Grzywacz felt would be more tactful. Altogether, Cooper and Grzywacz visited eleven establishments. In each case, they informed the owner that the sheriff wanted all further payments to be made to

him, and they negotiated with the owner regarding the price per prostitute (normally fifty dollars per week) or per tow (six dollars each). Grzywacz arranged to make weekly pickups. Six of the owners agreed, but five refused for various reasons. One owner of a lounge engaged in prostitution, for example, said that he did not have to pay them "because he was taking care of a judge in Madison County." Another pointed out that while his bar was located in Madison County his motel rooms were in the rear of the bar, across the county line in St. Clair County.

The plan began to disintegrate in December, 1971, when a sergeant in the Sheriff's Office, who was unaware of the payoff scheme, led a raid on Myrene's Steakhouse, one of the principal contributors. Shortly thereafter, Maeras called in the sergeant and asked why he had not informed his superiors prior to the raid. The sergeant promised to inform Maeras in advance of any possible future raids. Cooper continued to make pickups at Myrene's until May, 1972, when another raid—this one conducted by two assistant State's Attorneys—closed the establishment down again. Maeras was again informed of this raid only after it took place.

Meanwhile, Maeras and Cooper had arranged to transfer to a remote area of the county another deputy in the department who was causing problems for Club J, another house of prostitution involved in the scheme. Payments totalling approximately $10,000 were made by Club J until January, 1973, when the club was raided by the Illinois State Police. The Madison County Sheriff's Office was notified of the raid only on the day it took place; the organizer of the raid was opposed to even that late notice. The owners of the club telephoned Grzywacz during the raid to learn why they were being raided. Grzywacz explained later that Maeras had been out of town when

1. Grzywacz was one of the defendants in a previous RICO case decided by this court, *United States v. Grzywacz*, 603 F.2d 682 (7th Cir. 1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980). That case concerned the City of Madison Police Department, not the county sheriff's office, but otherwise the facts were closely related to the events here. Much testimony was admitted in that case regarding Grzywacz's activities at the county level. Grzywacz testified as a prosecution witness in the trial in this case.

the search warrant had been prepared and filed. Club J did not reopen for more than a year, when it did so under the name of a new owner. It was raided shortly thereafter by sheriff's deputies led by Deputy Gary Lee Burns.

The Internal Revenue Service began an investigation in early 1974 of Grzywacz's tax liabilities for 1970, 1971, and 1972, the years during which he was receiving the payoffs. Grzywacz, Cooper, and Maeras discussed the situation and developed a story to tell the IRS that the two deputies had been conducting an investigation for Maeras. Grzywacz was to say that the investigation was supervised by Captain Demos Nicholas of the Sheriff's Office, since Nicholas had died before them. He was also to claim that the investigation had discovered that a former deputy named Dilly Connors was receiving payoffs. After Maeras had signed a letter authorizing Grzywacz to speak to the IRS and referring to "an investigation performed by him for me, concerning suspected unlawful operations in Madison County," Grzywacz told the story as prepared to the IRS. Cooper and Maeras were both later interviewed under oath and repeated the same story. By early 1975, the IRS declared that Grzywacz owed $6,000 in interest and penalties for money collected from the Club J and others. Grzywacz paid the $6,000, but in September, 1977, even though Cooper and Maeras had discontinued all contacts with him, he told the investigation story to a federal grand jury. He was indicted and convicted on charges of perjury and racketeering.[2]

In addition to the towing and prostitution payoffs, a second aspect of corruption of Sheriff Maeras and Deputy Cooper involved the Madison County Deputy Sheriffs' Association ("DSA"), which had been formed in 1970 as a bargaining unit for the deputies. Shortly after DSA's formation, the deputies joined another union; DSA, which had one hundred percent membership, became a social and charitable organization. Defendant Cooper was the president at that time, and Gary Lee Burns was secretary. In 1971, at the urging of Cooper, DSA contracted with the defendant Leland L. Stoller to organize and promote a "Sheriff's Dance" to raise money for DSA. Stoller paid his own solicitation expenses and received 75% of the money collected; DSA received the other 25%. The first dance, held in February, 1972, was a success and raised thousands of dollars for DSA.

Sheriff Maeras discussed Stoller and his fund-raising activities with Cooper and Burns a month or so later. He asked them, "What's in it for old John?" Cooper answered that he would work something out with Stoller. When Stoller next returned to Madison County a few months later, Cooper and Burns met. Cooper explained to Stoller what a powerful man Maeras was in Madison County and that without his approval, any fund-raising activity would be doomed. Stoller objected at first, but they soon reached an agreement by which Stoller was to pay ten percent to Maeras of the gross money collected. Stoller, the defendant Lee Stoller Enterprises, and DSA then executed a contract for further fund-raising activities, but that contract did not mention that any money would go to Maeras.

A second dance was held in September, 1972, and more were to follow. Stoller delivered cash to Cooper and Burns, and they passed it along to Maeras at his office. After a few deliveries, however, the two deputies decided that Maeras should not get all the money while they took all the risks, so they began to skim some money off the top of the first skim and keep it for themselves. Stoller paid Maeras approximately $10,000 to $12,000; Cooper and Burns kept about $3,000 each for their efforts.

Trouble began to develop for this scheme when Burns, who had replaced Cooper as president of DSA, was succeeded by John Slotta in May, 1975. The new management of the association noticed that the books kept by Cooper and Burns were incomplete and that DSA had accounted only for a small portion of the money raised by Stol-

---

**2.** This court affirmed that conviction in *United States v. Grzywacz, supra* note 1.

ler. They also noted that checks had been made payable to 006 Detective Agency from the DSA account; the two owners of the agency were Cooper and Stoller. The new officers confronted Stoller, who could not explain the discrepancies. He reimbursed DSA $650 for some of the unauthorized expenditures. Nevertheless, DSA terminated all business with Stoller about December 1, 1975. DSA was disbanded in August, 1976.

## II

On November 29, 1978, a federal grand jury indicted John Maeras, John M. Cooper, Leland L. Stoller, and Lee Stoller Enterprises, Inc. for conspiracy to violate RICO.[3] All defendants were also charged with fourteen counts of mail fraud, 18 U.S.C. § 1341, and six counts of wire fraud, 18 U.S.C. § 1343. Four counts charged defendants Maeras and Cooper with making or inducing false statements within the jurisdiction of the Internal Revenue Service, 18 U.S.C. § 1001. One final count charged Maeras and Cooper with obstructing justice by persuading Gary Lee Burns to testify falsely before a grand jury, 18 U.S.C. § 1503. On February 25, 1979, after a two-week jury trial, the jury found defendants guilty on all but three counts.[4] The district court denied the defendants' post-trial motion and, on May 25, 1979, sentenced Cooper to a total of fifteen years and Stoller to three years of imprisonment. Lee Stoller Enterprises, Inc. was fined $10,000. Maeras was later sentenced to a total of fifteen years imprisonment as well.

After the appeal was argued before a panel of this court but prior to a decision, the judges in regular active service voted to hear the appeal en banc because of the importance of the issue of whether a public entity may be a RICO "enterprise".

## III

The defendants' principal contention is that the RICO statute may not properly be applied to them because the Madison County Sheriff's Office is not an "enterprise" within the meaning of the RICO statute. The evidence against the defendants relates to two series of actions. The first was a scheme to extort payoffs from houses of prostitution and towing companies within Madison County, Illinois. The other involved skimming funds from contributions to the Madison County Deputy Sheriffs' Association. The connection between these two series of events was their inclusion in one illegal "enterprise": namely, the Madison County Sheriff's Office. The question whether RICO was properly applied to the sheriff's office as an "enterprise" is thus crucial to the outcome of this case.

RICO was enacted as Title IX of the Organized Crime Control Act of 1970, an eleven-title attack on organized crime. Section 1962 of RICO makes it a federal offense (1) to receive or use income from "racketeering activity" or "collection of an unlawful debt" to acquire an interest in or establish an enterprise engaged in interstate commerce; (2) to acquire through a "pattern of racketeering activity" or collection of unlawful debt any control of an enterprise engaged in interstate commerce; or (3) to participate in the conduct of any enterprise engaged in interstate commerce through a pattern of racketeering activity or collection of unlawful debt. 18 U.S.C. § 1962.[5]

RICO is one part of the Organized Crime Control Act, which is, as the Supreme Court has noted, "a carefully crafted piece of legislation." *Iannelli v. United States*, 420 U.S. 770, 789, 95 S.Ct. 1284, 1295, 43 L.Ed.2d

---

**3.** The statute, 18 U.S.C. §§ 1961–68, was enacted as Title IX of the Organized Crime Control Act of 1970. Specifically, defendants were charged with a violation of section 1962(d), a conspiracy to violate RICO.

**4.** At the close of the Government's case, the trial court had dismissed two wire fraud counts and the obstruction of justice count.

**5.** A " 'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." 18 U.S.C. § 1961(5).

616 (1975). At the outset of the Act, Congress forcefully expressed its desire to eradicate organized crime and corruption. The Act's Statement of Findings and Purpose declares:

(1) organized crime in the United States is a highly sophisticated, diversified, and widespread activity that annually drains billions of dollars from America's economy by unlawful conduct and the illegal use of force, fraud, and *corruption*; ...

(3) this money and power are increasingly used to ... *subvert and corrupt our democratic processes*;

(4) organized crime activities in the United States ... *undermine the general welfare of the Nation and its citizens*; ....

Pub.L.No. 91–452, § 1 (emphasis added).

It is generally well-known that one of the primary tools in the hands of organized crime is the corruption of public officials and the subversion and undermining of public agencies. Congress used as strong language as it could muster to declare war on crime and the use of those tools—corruption, subversion and undermining of public officials.[6] With these purposes in mind, the broad scope of 18 U.S.C. § 1962(c) is easily understood:

It shall be unlawful for any person employed by or associated with *any enterprise* engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(Emphasis added.)

Section 1961(4) of the Act defines enterprise:

"enterprise" includes *any* individual, partnership, corporation, association, or other legal entity, and *any* union or group of

individuals associated in fact although not a legal entity; ....

(Emphasis added.)

The word "any", here used three times, has a comprehensive meaning of "all or every." *Kalmbach, Inc. v. Ins. Co. of State of Pennsylvania*, 529 F.2d 552, 556 (9th Cir. 1976). This language is strong and plain. In a case involving the interpretation of "any other immoral purpose," the Supreme Court said, in *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917):

It is elementary that the meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, and if the law is within the constitutional authority of the law-making body which passed it, the sole function of the courts is to enforce it according to its terms ....

Where the language is plain and admits of no more than one meaning the duty of interpretation does not arise and the rules which are to aid doubtful meaning need no discussion.

(Citations omitted).

Congress specifically directed that RICO "shall be liberally construed to effectuate its remedial purposes." Pub.L.No. 91–452, Title IX, § 904, 84 Stat. 941 (1970). *United States v. Forsythe*, 560 F.2d 1127, 1135–36 (3d Cir. 1977); *United States v. Parness*, 503 F.2d 430, 439 (2d Cir. 1974), *cert. denied*, 419 U.S. 1105, 95 S.Ct. 775, 42 L.Ed.2d 801 (1975). *Cf. United States v. Cappetto*, 502 F.2d 1351, 1358 (7th Cir. 1974), *cert. denied*, 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975). The statute is so broad that it applies to foreign enterprises as well as to domestic ones, *Parness*, 503 F.2d at 438–40, and to small enterprises as well as to large ones, *United States v. Campanale*, 518 F.2d 352, 364 (9th Cir. 1975), *cert. denied sub nom. Matthews v. United States*, 423 U.S. 1050, 96 S.Ct. 777, 46 L.Ed.2d 638 (1976).

---

**6.** The dictionary definition of "corruption" includes "inducement (as of a political official) by means of improper considerations (as bribery) to commit a violation of duty (the corruption of officials by gambling bosses) (exposing corruption in city politics)...." A dictionary example of "subvert" is "tear down our free institutions and subvert our form of government into a tyranny." Webster's Third New International Dictionary (1966).

Very recently, the Supreme Court has held,[7] and before it most of the circuits have held,[8] that an "enterprise" within the meaning of RICO includes illegal enterprises as well as legitimate ones.

In concluding that the term "enterprise" encompasses both legitimate and illegitimate enterprises, the Supreme Court said, "[t]here is no restriction upon the associations embraced by the definition" of the word "enterprise". *United States v. Turkette,* —— U.S. ——, ——, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981). The Court, examining the legislative history and the language of the statute, emphatically rejected any narrow definition of the term "enterprise":

> Considering . . . [the] statement of the Act's broad purposes, the construction of RICO suggested by respondent and the court below is unacceptable. . . . In view

of the purposes and goals of the Act, as well as the language of the statute, we are unpersuaded that Congress nevertheless confined the reach of the law to only narrow aspects of organized crime. . . .

> . . . .

> The language of the statute, however,— the most reliable evidence of its intent— reveals that Congress opted for a far broader definition of the word "enterprise," and we are unconvinced by anything in the legislative history that this definition should be given anything less than its full effect.

*United States v. Turkette,* —— U.S. at —— —— ——, ——, 101 S.Ct. at 2532, 2533–34.

■ Finally, several circuits including our own have held that "enterprise" encompasses public bodies and entities as well as private entities.[9] As we concluded in *Grzy-*

---

7. *United States v. Turkette,* —— U.S. ——, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981).

8. Second Circuit: *United States v. Errico,* 635 F.2d 152, 155 (2d Cir. 1980); *United States v. Mannino,* 635 F.2d 110, 117–18 (2d Cir. 1980); and *United States v. Altese,* 542 F.2d 104, 106–07 (2d Cir. 1976), *cert. denied sub nom. Napoli v. United States,* 429 U.S. 1039, 97 S.Ct. 736, 50 L.Ed.2d 750 (1977).

Third Circuit: *United States v. Provenzano,* 620 F.2d 985, 992–93 (3d Cir.), *cert. denied,* 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980); *United States v. Manchester,* 605 F.2d 1198 (3d Cir. 1979), *cert. denied,* 445 U.S. 945, 100 S.Ct. 1344, 63 L.Ed.2d 780 (1980) (affirming district court without opinion).

Fourth Circuit: *United States v. Whitehead,* 618 F.2d 523, 525 n.1 (4th Cir. 1980).

Fifth Circuit: *United States v. Diecidue,* 603 F.2d 535, 545 (5th Cir. 1979), *cert. denied sub nom. Antone v. United States,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 781 (1980); *United States v. Malatesta,* 583 F.2d 748, 754 n.3 (5th Cir. 1978), modified en banc on other grounds, 590 F.2d 1379 (1979), *cert. denied sub nom. Bertolotti v. United States,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979); *United States v. Elliott,* 571 F.2d 880, 897–98 (5th Cir. 1978), *cert. denied sub nom. Delph v. United States,* 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978); *United States v. McLaurin,* 557 F.2d 1064, 1072–73 (5th Cir. 1977), *cert. denied sub nom. Hamilton v. United States,* 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978); *United States v. Morris,* 532 F.2d 436, 441–42 (5th Cir. 1976); and *United States v. Hawes,* 529 F.2d 472, 479 (5th Cir. 1976).

Sixth Circuit: *United States v. Sutton,* 642 F.2d 1001 (6th Cir. 1980) (en banc affirmance of convictions reversed in 605 F.2d 260 (1979)).

Seventh Circuit: *United States v. Aleman,* 609 F.2d 298, 303–05 (7th Cir. 1979), *cert. denied,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980); and *United States v. Cappeto,* 502 F.2d 1351, 1358 (7th Cir. 1974), *cert. denied,* 420 U.S. 925, 95 S.Ct. 1121, 43 L.Ed.2d 395 (1975).

Ninth Circuit: *United States v. Zemek,* 634 F.2d 1159, 1166–67 (9th Cir. 1980); and *United States v. Rone,* 598 F.2d 564, 568–69 (9th Cir. 1979), *cert. denied sub nom. Little v. United States,* 445 U.S. 946, 100 S.Ct. 1345, 63 L.Ed.2d 780 (1980).

District of Columbia Circuit: *United States v. Swiderski,* 593 F.2d 1246, 1248–49 (D.C.Cir. 1978), *cert. denied sub nom. McGowan v. United States,* 441 U.S. 933, 99 S.Ct. 2055, 60 L.Ed.2d 662 (1979) (dictum; enterprise was part legitimate and part illegitimate).

9. Third Circuit: *United States v. Bacheler,* 611 F.2d 443, 450 (3d Cir. 1979) (Philadelphia Traffic Court); *United States v. Frumento,* 563 F.2d 1083, 1089–92 (3d Cir. 1977), *cert. denied sub nom. Millhouse v. United States,* 434 U.S. 1072, 98 S.Ct. 1256, 55 L.Ed.2d 775 (1978) (Pennsylvania Bureau of Cigarette and Beverage Taxes). *See also, United States v. Herman,* 589 F.2d 1191 (3d Cir. 1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2014, 60 L.Ed.2d 386 (1979) (applied RICO to Pittsburgh magistrates without discussion); and *United States v. Vignola,* 464 F.Supp. 1091, 1095–96 (E.D.Pa.1979), *aff'd mem.,* 605 F.2d 1199 (3d Cir. 1979), *cert. denied,* 444 U.S. 1072, 100 S.Ct. 1015, 62 L.Ed.2d 753 (1980) (Philadelphia Traffic Court).

*wacz*, 603 F.2d at 687, consideration of the purpose of the Organized Crime Control Act, the plain words of the RICO statute, and the volume of past precedent leads us to conclude here again that a public entity may constitute an "enterprise" within the meaning of RICO.[10] Specifically, we find the office of Madison County Sheriff is such an enterprise.

## IV

The defendants contend that the trial court erred in denying their motions for severance of their respective trials. The question of whether charges should be severed for trial is for the discretion of the trial judge, whose decision will be reversed only upon a showing of clear abuse. *United States v. McPartlin*, 595 F.2d 1321, 1333 (7th Cir.), *cert. denied*, 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979).

Defendants here, as in most RICO cases, were alleged to have committed different predicate crimes. But in a trial on RICO charges, a particular defendant may be the victim of spillover testimony regarding other, more violent or heinous, predicate crimes. This can happen because the specific purpose of the substantive provisions of RICO is to tie together diverse parties and crimes. Under RICO, it is irrelevant that each defendant participated in the enterprise's affairs through different and unrelated crimes. *United States v. Elliott*,

571 F.2d 880, 902 (5th Cir.), *cert. denied sub nom. Delph v. United States*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978).

The trial court adequately protected each defendant's rights by instructing the jury that it should consider the evidence separately as to each defendant and each count. Tr. 2263. *United States v. Le-Compte*, 599 F.2d 81, 82–83 (5th Cir. 1979), *cert. denied* 445 U.S. 927, 100 S.Ct. 1313, 63 L.Ed.2d 759 (1980). Although the defendants used different means, they were alleged to have participated in the same offense: furtherance of the enterprise. Therefore, severance was not required. *United States v. Bright*, 630 F.2d 804, 812–13 (5th Cir. 1980).

Closely allied to the severance argument is the defendants' claim that the trial court erred in admitting into evidence out-of-court statements of co-conspirators in furtherance of the conspiracy and admissions by defendants. The defendants have not specified the particular statements or admissions to which they object. The trial judge employed the pre-*Santiago* method of admission, *see United States v. Santiago*, 582 F.2d 1128, 1131 (7th Cir. 1978): conditional admission with cautionary instructions. Tr. 159–60, 649–50. The judge followed up on the conditional admission by issuing the customary pre-*Santiago* conspiracy instruction limiting the jury's consider-

Fourth Circuit: *United States v. Altomare*, 625 F.2d 5, 7 (4th Cir. 1980) (County Prosecuting Attorney); *United States v. Karas*, 624 F.2d 500, 504 (4th Cir. 1980) (County Prosecuting Attorney); *United States v. Baker*, 617 F.2d 1060, 1061 (4th Cir. 1980) (County Sheriff).
Fifth Circuit: *United States v. Bright*, 630 F.2d 804, 829 (5th Cir. 1980) (County Sheriff); *United States v. Brown*, 555 F.2d 407, 415–16 (5th Cir. 1977), *cert. denied*, 435 U.S. 904, 98 S.Ct. 1448, 55 L.Ed.2d 494 (1978) (City Police Department).
Seventh Circuit: *United States v. Grzywacz*, 603 F.2d 682, 685–87 (7th Cir. 1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980) (City Police Department).

**10.** G. Robert Blakey, chief counsel of the Senate Subcommittee on Criminal Laws and Procedures in 1969–70, when the Organized Crime Control Act was passed, generally credited with being the author of the Act, supports the broad reading of RICO. *See* Tybor, *Racketeering Law Facing Key Test*, 3 Nat'l L.J. 1, 19 (Dec. 29, 1980); Blakey and Gettings, *RICO's Problem in the Courts: A Classic Case of Misreading*, 3 Nat'l L.J. 26 (March 9, 1981).

In *United States v. Gillock*, 587 F.2d 284, 303 (6th Cir. 1978), *rev'd on other grounds*, 445 U.S. 360, 100 S.Ct. 1185, 63 L.Ed.2d 454 (1980), it appears that the RICO "enterprise" involved was the Tennessee General Assembly. This fact was not involved in the Supreme Court's review of the case, but the Court observed:

Of course, even a Member of Congress would not be immune under the Federal Speech or Debate Clause from prosecution for the acts which form the basis of the ... RICO, 18 U.S.C. § 1962, charges here.

*United States v. Gillock*, 445 U.S. 360, 373 n.11, 100 S.Ct. 1185, 1193 n.11, 63 L.Ed.2d 454 (1980).

ation of the declarations of co-conspirators. Tr. 2290–93. Inasmuch as the pre-*Santiago* method required the jury to find that a conspiracy existed beyond a reasonable doubt while the *Santiago* method requires the judge to make that determination by using a less rigid preponderance test, and inasmuch as the present trial was conducted only months after *Santiago*, which did not totally condemn the former practice, the defendants' blanket objection is not well taken. In regard to admissions by the defendants, cautionary instructions were given as the testimony was received, Tr. 1307, 1328–29, and again in the final instructions, Tr. 2293.

V

The defendants argue that the verdicts were against the manifest weight of the evidence. Viewed in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the evidence of the guilt of Maeras and Cooper was overwhelming. The testimony of Gary Lee Burns and Ronald Grzywacz constituted direct evidence of the participation by the defendants in the Department's pattern of racketeering activity. Although Stoller did not participate in the towing and prostitution payoffs, there was substantial direct evidence of his involvement in the bribery of the Sheriff and his deputies.

We reject Stoller's contention that he was a victim of the extortionate acts underlying the mail and wire fraud charges, and that he could therefore not be prosecuted as a participant. We find his position indistinguishable from that of the defendant supplier in *United States v. George*, 477 F.2d 508 (7th Cir.), *cert. denied sub nom. Greensphan v. United States*, 414 U.S. 827, 94 S.Ct. 49, 38 L.Ed.2d 61 (1973). In that case, the defendant supplier's kickbacks made him a participant in the scheme to defraud, since he thereby gained a monopolistic position in supplying his cabinets to Zenith, the defrauded party. Similarly, here Stoller was able to maintain his position as sole agent for DSA, and he profited from his position handsomely.

Stoller's involvement in the RICO enterprise itself was substantial; he agreed to pay 10% of the gross money solicited for DSA to the Sheriff, who eventually received $10,000 to $12,000; defendant Cooper and another deputy each received about $3,000. This money was paid so that Stoller could maintain a monopoly on the lucrative Sheriff-connected solicitations. Seven dances were solicited in five years; other solicitations were made for ad books and decals. The Sheriff received numerous complaints about the nature of the solicitations and without the bribery, the solicitations would undoubtedly not have continued. In addition to paying off Maeras through Cooper and Burns, Stoller entered into the "006 Detective Agency" with Cooper, through which Stoller, within something less than a year, paid to Cooper several thousand dollars. Also, some 006 expenses were paid out of DSA contributions. Cooper, in return, used his influence as a deputy sheriff to promote Stoller's solicitation activities with other sheriff departments throughout the country. Stoller made use of a letter on the letterhead of "John Maeras, Sheriff of Madison County," signed by "Lt. John Cooper, Madison County Sheriff Department," and addressed "To Whom It May Concern," saying:

Stoller enterprises of Peoria, Illinois is presently conducting a sales program to obtain sponsors for our 2nd Annual Sheriff's Dance to be held on Fri., Sat., & Sun. Dec. 15, 16 & 17 1972.

Our Deputy Sheriff's Assn. has again retained Stoller Enterprises because of the outstanding job the firm did last year in soliciting Ads for our year book.

The Cristy Lane Show brought the largest gathering of people together (for our dance) in the history of Madison County, Illinois. This would include, of course, all political functions.

I am sure that the professional ethics of Stoller Enterprises would be of great value to any Police Agency wishing to raise funds for any cause.

Gov't. Ex. 50.

An analogous situation occurred in *United States v. Bright*, 630 F.2d 804 (5th Cir.

1980), where Bright's sole participation in the sheriff's "enterprise" took the form of bribery of the sheriff so that Bright could operate his bail bonding business as a monopoly. The Fifth Circuit held that "there was sufficient evidence from which a jury could find that Bright participated in the affairs of the Sheriff's office by bribing the Sheriff." 630 F.2d at 831; *see also id.* at 829–31.

We conclude that the verdicts were supported by substantial evidence as to each defendant.

## VI

Having examined the record, we find that the defendants' remaining arguments are without merit.

For the foregoing reasons, the judgments of conviction are

AFFIRMED.

FAIRCHILD, Chief Judge, dissenting in part.

## I

Defendants sought dismissal of Count 1 of the Indictment on the ground that the Sheriff's Department is not an "enterprise" under RICO, and that Count 1 therefore did not state an offense.

I agree with the majority that a sheriff's department is an "enterprise." Accordingly, 18 U.S.C. § 1962(c) makes it unlawful for a person employed by or associated with a sheriff's department whose activities affect interstate commerce to conduct or participate in the conduct of the department's affairs through a pattern of racketeering activity. Section 1962(d) makes it unlawful to conspire to violate subsection (c). Count 1 charged Maeras (the Sheriff), Cooper (a Deputy Sheriff), Stoller, and his corporation with so conspiring from January 1, 1971 to November 29, 1978.

I agree there was no error in denying the motion to dismiss Count 1.

## II

I do have a problem, however, with the proof of Count 1. There was no evidence that Stoller agreed in any way to the series of extortions in which Maeras and Cooper (and others) had been involved. At best for the government, there was evidence of two distinct agreements, with Stoller and his company parties to only one of them.

It is clear enough that the series of extortions and bribes related to the conduct of affairs of the Sheriff's Department. In return for the money, the Sheriff and his deputies agreed to refrain from enforcing the law. Bribery and extortion constitute racketeering activity under § 1961(1) and two or more instances could be deemed a pattern of racketeering activity under § 1961(5). Maeras and Cooper, accordingly, could have been found guilty of conspiracy to conduct the affairs of the Department through a pattern of racketeering activity. It should be noted, however, that these episodes occurred from 1970 to 1973, and separate prosecution for that pattern of activity would have been barred by the statute of limitations at the time of the indictment.

Stoller's activity was carried on from 1971 to 1975. It consisted of fund raising for the Deputy Sheriff's Association. Although that type of activity has often been criticized for its sinister implications, there is no claim or proof in this case that contributions to the Association bought favors from the Sheriff's Department or otherwise affected the conduct of the Department's affairs. There was evidence, however, that after mid-1972 Stoller agreed with Maeras, through Cooper, that a portion of the contributions obtained would be paid to Maeras. This diversion of funds was not disclosed to the Association members or contributors, and the theory of the mail fraud convictions was that the members and contributors were thus defrauded. There was evidence, although disputed, that the diversions of money occurred, and thus there was support for the mail fraud and wire fraud convictions.

Stoller was induced to pay Sheriff Maeras by Cooper's and Burns' assertion that because Maeras knew everybody and was powerful in the county, fund raising would be doomed if it did not have his approval. Acts of mail fraud and wire fraud are racketeering activity under § 1961(1), and two acts constitute a pattern under § 1961(5), but it is not so clear that the Sheriff's receipt of money in return for tacit approval of legitimate fund raising activity constitutes the conduct of the affairs of the Sheriff's Department. I would not, however, hold as a matter of law that it did not. So assuming, Stoller could be convicted of conspiracy with Cooper and Maeras to conduct the affairs of the Sheriff's Department through a pattern of repeated acts of mail fraud, but that pattern did not include the bribery and extortion episodes.

I disagree with the holding in *United States v. Elliott*, 571 F.2d 880, 902 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), relied on by the majority, that a defendant's complicity in one type of unlawful activity in the conduct of the affairs of an enterprise can make him criminally responsible under RICO for other and distinct types of unlawful activity of which he has no knowledge or responsibility in fact. Such a conclusion, applied to the facts of this case, significantly expands the reach of conspiracy prosecutions. *See Blumenthal v. United States*, 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947).

If Maeras and Cooper had been charged with conducting or conspiring from 1971 to early 1973 to conduct the affairs of the Department through a pattern of racketeering activity, the statute of limitations would have barred the prosecution. Assuming again, however, that the Sheriff's receipt of a portion of the contributions to the Association constitutes the conduct of the affairs of the Sheriff's Department, Maeras and Cooper might have been charged, and convicted on the present evidence, of conspiracy from 1971 to 1975 to conduct the affairs of the Sheriff's Depart-

ment through a pattern of racketeering activity consisting of *both* the extortion conduct and the mail fraud conduct. Probably the trial on a charge of a single conspiracy with Stoller and his company has not been unfair to Maeras and Cooper, even though the proof does not support the proposition that Stoller and his company were part of the single conspiracy charged.

It seems to me, however, that Stoller and his company have suffered prejudice in being tried on a charge of a single conspiracy which embraced within the "pattern" a great many corrupt acts quite different from and more dramatic, colorful, and obviously culpable than the nondisclosure in which they may have been involved. Once it became evident that Stoller and his company were not accountable for the extortion and bribery, they may have been entitled to severance and a separate trial, probably on a superceding indictment confining the conspiracy count to the mail and wire fraud allegations. If not entitled to severance, they were at least entitled to instructions that would have limited the proof to be considered against them. *Cf. Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).

SWYGERT, Circuit Judge, dissenting.

Although I originally voted to reverse these convictions on the ground that the RICO statute could not be applied to public entities,[1] because of the Supreme Court's decision in *United States v. Turkette*, —— U.S. ——, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), I am compelled to vote with the majority on the RICO issue. I join, however, in the dissents filed by Chief Judge Fairchild and Judge Cudahy on the issues of joinder and severance.

CUDAHY, Circuit Judge, dissenting:

The indictment in the instant case charged one RICO conspiracy encompassing two clearly separate and distinct criminal schemes. The only connection between the

---

1. *See* my dissent in *United States v. Grzywacz*, 603 F.2d 682, 690 (7th Cir. 1979), *cert. denied*, 446 U.S. 935, 100 S.Ct. 2152, 64 L.Ed.2d 788 (1980).

schemes was "their inclusion in one illegal 'enterprise': [1] namely, the Madison County Sheriff's Office." Maj. Op. at 1316. I believe, however, that the evidence here established two independent RICO conspiracies, *see* Chief Judge Fairchild's dissent at 1321, 1322, and the joinder of those crimes in one indictment was therefore improper. Fed.R.Crim.P. 8.[2] *See also United States v. Turkette*, 632 F.2d 896, 906–10 (1st Cir. 1980), *rev'd on other grounds*, —— U.S. ——, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). Reversal is thus required under *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), which held that proof of multiple conspiracies under an indictment alleging a single conspiracy can constitute a material variance from the indictment and violate the rights of the defendants not to be tried *"en masse* for the conglomeration of distinct and separate offenses committed by others. . . ." *Kotteakos*, 328 U.S. at 775, 66 S.Ct. at 1252.

Unlike the majority, I do not agree that RICO has modified the established law of conspiracy in such a way as to sustain the indictment under the particular facts and allegations of this case. Thus, *United States v. Elliott*, 571 F.2d 880 (5th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), relied upon an expansive interpretation of RICO's purpose to hold that the interdependence previously required for independent conspiracies to become parts of a single "chain" conspiracy, was no longer required under RICO. Under RICO, this linkage is supplied by the fact that each independent conspiracy was intended to further the affairs of the "enterprise." *Elliott*, 571 F.2d at 902–03. But

here, the Deputy Sheriffs' Association kickback scheme which linked Stoller and Stoller Enterprises to the activities of Sheriff Maeras was not intended to further the affairs of the Madison County Sheriff's Department, the only "enterprise" alleged in this indictment. *Cf. United States v. Webster*, 639 F.2d 174, 183–86 (4th Cir. 1981). Even under the position taken by the Fifth Circuit in *Elliott*,[3] RICO has its limits, and those limits have been exceeded in the instant case.

Even if the activities of the defendants constituted one RICO conspiracy as alleged in the indictment, Stoller and Stoller Enterprises were clearly prejudiced by the failure of the district court to grant their request for a severance. The payoff schemes, of which Stoller was undisputably ignorant, involved evidence of illegal activities of a wholly different nature from the Deputy Sheriffs' Association fund-raising kickbacks. The jury could not help but be influenced by the evidence of these other apparently flagrant offenses.

I respectfully dissent to the extent indicated.

---

1. Although I had perceived certain difficulties in treating a sheriff's office as a RICO "enterprise" *before the recent decision of the Supreme Court in United States v. Turkette*, —— U.S. ——, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), I think the general thrust of *Turkette* strongly suggests that a sheriff's office can be such an "enterprise." I therefore join Part III of the Majority Opinion.

2. Because the events relating to the payoff scheme occurred from 1970 to 1973, any attempt to prosecute that particular RICO conspiracy is barred by the statute of limitations.

3. I, like Chief Judge Fairchild, have my doubts about whether *Elliott* was correct in its broad revamping of the law of conspiracy for RICO prosecutions. Fairchild, C. J., dissenting, *supra* at 1321–1322. *See also United States v. Zemek*, 634 F.2d 1159, 1169 n.12 (9th Cir. 1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981).